[Civ. No. 61947. Second Dist., Div. One. Apr. 13, 1982.]

ROGER PATING, Plaintiff and Appellant, v.
BOARD OF MEDICAL QUALITY ASSURANCE et al., Defendants
and Appellants.

610

COUNSEL

Lewin & Lewin, Henry Lewin, Ann R. Lewin and Thomas Kallay for Plaintiff and Appellant.

George Deukmejian, Attorney General, and Steven M. Kahn, Deputy Attorney General, for Defendants and Appellants.

OPINION

HANSON (Thaxton), J.—The appeal and cross-appeal in this case raise issues relating to the admissibility of patient medical records from the hospital and the doctor's office, respectively, in a disciplinary hearing before the Division of Medical Quality and the Board of Medical Quality Assurance (hereinafter referred to collectively as the Board). Roger Pating, M.D., appeals from a judgment granting his petition for writ of mandate insofar as the court found admissible the hospital records pertaining to certain patients named in the accusation on whom he allegedly performed or failed to perform specific surgical procedures. The

Board cross-appeals from the judgment insofar as the court ruled that the office medical charts relating to the same patients, together with information obtained therefrom, were not admissible at the hearing before the Board.

FACTS

On or about March 7, 1979, the Board, the state agency charged with enforcement of the Medical Practice Act (Bus. & Prof. Code, § 2000 et seq.) filed an accusation against Roger Pating, M.D. The Board therein charged Pating with acts involving dishonesty and the falsification of medical records (Bus. & Prof. Code, §§ 2361, subd. (e) and 2411) in connection with his treatment of 10 named patients from 1970 through 1973. The accusation alleged that in the case of each identified patient Pating made entries in the hospital charts showing that a specific surgical procedure was performed and the surgery was so billed whereas in fact the surgical procedure thus reported in each instance was not performed. The accusation further alleged that Pating treated the 10 named patients while engaged in practice as a member of the San Gabriel Valley ENT Medical Group, Inc. (hereinafter referred to as the Medical Group) and that hospital and office charts would show that Pating billed insurance carriers for these surgeries recorded in the charts but not performed.

On March 14, 1979, Pating was served. On March 26, 1979, he filed a notice of defense in which he raised certain affirmative defenses and requested a hearing. On June 12, 1979, Pating was notified that hearing would be conducted by an administrative law judge pursuant to provisions of the Administrative Procedures Act (Gov. Code, § 11500 et seq.) in December 1979.

At the hearing which commenced December 3, 1979, Pating was present in person and with counsel and proceedings were reported. Pating moved to exclude the hospital and office records of each of the 10 patients named in the accusation on the grounds that such records were improperly and illegally obtained by the Board in violation of the physician-patient privilege and the patients' rights to privacy. On stipulation of counsel the evidence presented at the hearing was limited to the issue of the admissibility of these records with the understanding that the question might be presented to the court for decision prior to completion of the proceedings, all parties waiving exhaustion of administrative remedies due to the significance of the preliminary issues presented.

The evidence adduced at the hearing discloses that on June 24, 1976, Donald Adams, the executive vice president of Foothill Presbyterian Hospital (hereinafter referred to as Foothill Hospital) notified the Board pursuant to Business and Professions Code section 805 that Pating had resigned from the medical staff after his staff privileges were summarily suspended December 16, 1975, pending review by a medical committee. The Board on July 26, 1976, assigned Senior Special Investigator John Butler to investigate the circumstances relating to this disciplinary report. Butler on September 16, 1976, visited Foothill Hospital where he met with Adams, Dr. Morgan, chief of staff, and Dr. Zalta, immediate past chief of staff.

The hospital administrator and both doctors were cooperative and expressed their willingness to provide whatever information was available. Butler learned that Pating during the period when these patients were treated (1970 through 1973) had practiced medicine in a professional medical corporation with Drs. Zalta and Morgan. Pating terminated his association with the Medical Group in January 1974. The doctors told Butler that Pating had resigned from the hospital staff after it was learned that numerous patients of his had undergone surgery that was not needed and that operative reports made by Pating recited events that had not actually happened during surgery. At the time of this interview they gave Butler case summaries which they had prepared relating to 10 named patients. In these summaries they itemized what they believed was wrong in Pating's treatment of each patient and listed the charges. They also attached a list of physician witnesses.

Without further investigation and without contacting any of the identified patients, Butler on September 23, 1976, prepared separate declarations with respect to a number of investigative subpoenas. Each subpoena duces tecum requested the custodian of records at the several hospitals (Glendora Community Hospital, San Dimas County Hospital and Queen of the Valley Hospital, respectively) to produce the complete medical records of specific patients.

Butler made the following allegations in each declaration: "I am a senior special investigator of the Department of Consumer Affairs of the State of California; I am conducting an investigation of Roger Pating, M.D. involving an allegation of treatment to patients detrimental to their health. These activities, if confirmed, are violations of the Business and Professions Code of the State of California. Section

2361(b) B & P Code—Gross Negligence. Section 2361(c) B & P Code —Incompetence. The medical records pertaining to patients on page 1 may offer evidence to substantiate the aforementioned allegations related to the practice of medicine."

The subpoenas were served on all three hospitals September 24, 1976. Without objection each hospital served with a subpoena furnished to the Board between September 30 and October 5, 1976, the hospital charts on the named patients. One more hospital, Covina Inter-Community Hospital, when served with a similar subpoena in May 1977, responded promptly and without objection delivered the requested hospital records.

Butler at no time prior to the hearing in December 1979 contacted the patients whose records he obtained in this manner from the various hospitals nor did he attempt to procure from them consents or waivers. He nonetheless interviewed the physicians named who had examined the patients following surgery and obtained from them declarations concerning their postsurgery treatments.

None of these patients had been treated at Foothill Hospital. Drs. Zalta and Morgan told Butler they had acquired information regarding patients treated in other hospitals from patient files at the offices of the Medical Group where at least two of the patients were still being treated. Butler obtained from these doctors sometime between September 16 and October 15, 1976, without subpoena, the office medical records of the patients named in the accusation who had been treated by the Medical Group. Although Butler testified that he did not recall the details relating to the receipt of the office records, it may be inferred that they were offered to him by Drs. Morgan and Zalta voluntarily or were given to him on informal request. Butler also subpoenaed and obtained records for one patient from Pating or his counsel. When Pating's counsel reconsidered and requested return of these records, Butler returned the originals but kept copies.

The hospital and office charts thus obtained by Butler were reviewed by the Board's medical consultant and this information was utilized in preparing the accusation which alleged, inter alia, violations by Pating of Business and Professions Code sections 2361, subdivision (e), and 2411.

Eight of the ten patients appeared at the hearing pursuant to subpoena and each in his testimony unequivocally and expressly waived the physician-patient privilege and right to privacy, and agreed to the introduction of medical records. The administrative law judge denied Pating's motion to exclude the medical records of the eight patients who appeared and granted the motion without prejudice as to the other two.

The trial court upon hearing reviewed the entire administrative record. The court found that at no time did Butler or Drs. Zalta or Morgan invoke or raise the physician-patient privilege or the patients' right of privacy. Furthermore, at no time prior to the hearing in December 1979 were any of the patients named in the accusation contacted and advised of these rights or requested to consent to use of these documents or waive these rights. However, the eight patients who appeared and testified at the hearing upon being advised of the nature and extent of their rights waived, over Pating's objection, the physician-patient privilege and the constitutional right of privacy. The administrative law judge thereupon denied Pating's motion to exclude both the hospital and the office records as to the eight patients who waived. The hearing was continued to permit Pating to file a petition to obtain judicial review of the issues raised by the introduction of this evidence over objection of Pating.

The trial court held that the patients' hospital charts had been obtained validly pursuant to investigational subpoena duces tecum (Gov. Code, §§ 11180-11191); it concluded that the Board was not required to show either prior waiver or good cause in connection with issuance of the subpoena. The trial court further ruled that the exclusionary rule applied to the evidence in the form of office records obtained by Butler for use in pending administrative disciplinary hearings; that Pating had standing to object to introduction of illegally obtained evidence under the vicarious exclusionary rule; and that the illegality of the seizure could not be cured by the subsequent waiver or consent of the person whose rights were invaded; and that the voluntary disclosure by Pating's former partners without legal process or patient consent violated each patient's right of privacy.

The trial court therefore concluded that the hospital charts were admissible in evidence but that the Board abused its discretion in refusing as to all ten patients to exclude from evidence the office charts and information obtained therefrom. The court ordered a peremptory writ of mandamus to issue remanding the proceedings to the Board, directing it

to exclude from evidence the office charts of the ten patients. Both parties appealed from portions of the judgment adverse to their interests.

## ISSUES

Pating on appeal contends (1) that the hospital records were illegally obtained because the subpoena was invalid under any legal theory and specifically the declaration in support of the subpoena duces tecum was inadequate. (*Board of Medical Quality Assurance* v. *Gherardini* (1979) 93 Cal.App.3d 669 [156 Cal.Rptr. 55].)

The Board contends (2) that the trial court erred in holding that patients' office medical records were not admissible in evidence, since (a) Pating had no standing to object to admission of the records after patients consented to their use; (b) the office medical records were not obtained illegally by the Board; (c) the exclusionary rule is not applicable to the office medical records in administrative proceedings and were it applicable the inevitable discovery doctrine would preserve the admissibility of the office medical records.

## DISCUSSION

### I

A serious question is raised by the Attorney General as to the standing of Pating to object to the introduction of the hospital records on the ground of defects in the subpoenas. Once an institution has complied with a subpoena for the production of records, without questioning the regularity of the subpoena procedure or the adequacy of declarations, a defendant in a criminal case is not entitled to suppression of this evidence under Penal Code section 1538.5, since there can be, under the circumstances, no violation of Fourth Amendment rights. (*People* v. *Park* (1978) 87 Cal.App.3d 550 [151 Cal.Rptr. 146].)

The thrust of the constitutional right to privacy is protection of individuals against governmental intrusion through secret information seeking activities. (*White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222].) Insofar as the constitutional rights of privacy of the patients are protected by preventing infringement of their Fourth Amendment rights to be free of illegal searches and seizures of medical records, we conclude there is no such violation here under the authority of *Park.* Pating argues that he has standing to attack the validity of these subpoenas making the cavalier assertion that he is protecting the

third party patient's privacy rights. (*Board of Medical Quality Assurance* v. *Gherardini, supra*, 93 Cal.App.3d 669.) The court there held only that a hospital as third party custodian of privileged matter has standing to assert the statutory privilege (presumably physician-patient) on behalf of absent nonconsenting patients and to object under the vicarious exclusionary rule to admission of evidence obtained in violation of the patient's constitutional right of privacy. (*Id.*, at p. 675.)

Assuming, without deciding, that Pating had standing, there is no legal ground for his challenge to the administrative subpoenas under California decisional law. The patients' hospital charts were obtained pursuant to administrative subpoenas. (Gov. Code, §§ 11180 to 11191.) The heads of each department are authorized to make investigations and prosecute actions concerning subjects under their jurisdiction (Gov. Code, § 11180) and they may issue subpoenas for attendance of witnesses and production of records. (Gov. Code, § 11181, subd. (e).) Since this power is analogous less to a judicial function than to that of a grand jury which is empowered to investigate on mere suspicion that the law has been violated, no formal administrative hearing need be pending prior to issuance of such subpoenas. (*Brovelli* v. *Superior Court* (1961) 56 Cal.2d 524, 528-529 [28 Cal.Rptr. 422].) *Brovelli* expresses the legal principles controlling administrative subpoenas at the time the hospitals produced the requested records in 1976.

As the trial court found, the subpoenas and declarations satisfy the *Brovelli* test insofar as they indicate that inquiry is being made into treatments by Pating allegedly detrimental to the health of the specifically named patients which constitute violations of the Business and Professions Code. The allegations in the subpoenas are not general in character, since they request records of specific patients at specific hospitals for surgery allegedly performed by Pating in a specific month and year. There was no requirement that an affidavit showing good cause for production of the records be included with the subpoena. (*Fielder* v. *Berkeley Properties Co.* (1972) 23 Cal.App.3d 30, 40-41 [99 Cal.Rptr. 791].)

■ Nonetheless Pating further argues, and it is conceded by the Board, that the declarations are insufficient under the recent decision in *Board of Medical Quality Assurance* v. *Gherardini, supra*, 93 Cal. App.3d 669. That decision reversed an order of the trial court requesting Mount Helix General Hospital (Mt. Helix) and Mel Gherardini, custodian of records, to surrender patient records pursuant to investiga-

tive subpoenas issued by the Board on the basis of declarations substantially the same as those in the case at bench. The appellate court therein for the first time enunciated the rule that a declaration in support of an investigative subpoena duces tecum for production of patient hospital records must show good cause, including allegations of fact to demonstrate the relevance or materiality of the patient's medical records to the general charges against the doctor, and must show that the request can be granted "without abuse of a third party's constitutionally protected right of privacy." (*Id.*, at p. 681.)

The court reasoned that the physician-patient privilege (Evid. Code, §§ 990-1007) creates a "zone of privacy" which falls within the protective umbrella of the right of privacy afforded by the California Constitution, article I, section 1 (as amended Nov. 1974).[1] The court concluded that state intervention of the individual's right of privacy can be justified only by showing a compelling interest, and a governmental administrative agency is not exempt from the requirement of supporting its subpoenas with adequate declarations. In view of the patient's expectations of privacy in respect to his medical records (*Katz v. United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507]) the Board must conform to minimal due process standards by making a showing of either waiver and consent by the respective patients or good cause for production of the records. (*Id.*, at p. 680.)

Pating argues that *Gherardini* should be applicable to all cases pending on the date of its publication, May 16, 1979, since the principles therein enunciated were foreshadowed by prior decisions or reflect the application of previously existing law. (*People v. Heredia* (1971) 20 Cal.App.3d 194, 198-199 [97 Cal.Rptr. 488].) Contrary to Pating's claim, the *Gherardini* rule seeks to establish new legal principles which were not previously adumbrated by the decisional law. The trial court, which declined to give *Gherardini* retroactive application, in its memorandum of decision[2] found that Butler acted in good faith in obtaining

[1]Article I, section 1 in its current form, as amended November 1974, provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

[2]The court by minute order stated its reasons as follows: "(1) it invalidates a procedure which was apparently valid under statute as approved by the Supreme Court and followed in good faith by investigators throughout the field; (2) any foreshadowing of a change of acceptance of the procedure was not sufficiently great in 1976 to have alerted a reasonable investigator seeking to comply with the law; (3) the purpose of the exclusionary rule, which is to deter unlawful conduct of police officer by excluding from evidence the fruits of such conduct, would be little served here, given the apparent propriety of the investigator's conduct; and (4) although ratification by the person

the subpoenas and correctly points out that he could not in 1976 have anticipated the *Gherardini* application of the right of privacy or exclusionary rule, hence *Gherardini* is inapplicable. (See *People v. Kaanehe* (1977) 19 Cal.3d 1 [136 Cal.Rptr. 409, 559 P.2d 1028].)

■ The retroactivity principle is well illustrated by the line of decisions following *Burrows v. Superior Court* (1974) 13 Cal.3d 238 [118 Cal.Rptr. 166, 529 P.2d 590]. It was there for the first time held that since a bank customer entertains "a reasonable expectation of privacy" in the records of his banking transactions law enforcement officials are not entitled to obtain such records from the bank without subpoena. The California Supreme Court declined to give the *Burrows* rule retroactive application when a bank, without the defendant's knowledge or consent, gave an investigator from the district attorney's office various bank records regarding defendant. (*People v. Kaanehe, supra,* 19 Cal.3d 1.) The court there held *Burrows* to be applicable only in the case of records *seized* after the date the decision became final.

The court in *Kaanehe* explained the retroactivity principle as follows: "Whether a judicial decision establishing new constitutional standards is to be given retroactive effect is customarily determined by weighing the following factors: '(a) the purpose to be served by the new standards, (b) the extent of reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of retroactive application of the new standards.' [Citations.] 'It is also clear that the factors of reliance and burden on the administration of justice are of significant relevance only when the question of retroactivity is a close one after the purpose of the new rule is considered.' [Citation.] Decisions have generally been made fully retroactive only where the right vindicated is one which is essential to the integrity of the fact-finding process. On the other hand, retroactivity is not customarily required when the interest to be vindicated is one which is merely collateral to a fair determination of guilt or innocence. [Citations.] *Burrows* clearly falls within the latter category. Exclusion is not necessary to ensure the reliability of the fact-finding process at trial. [¶] No compulsion is present and the evidence seized is entirely trustworthy. As the purpose of the exclusionary rule in those circumstances is to deter illegal conduct by law enforcement officials, exclusion of evidence seized

whose rights have been invaded would not of itself justify prior unlawful conduct by the investigator, it is to be noted that petitioner does not seek to vindicate a private right of his own but that of his patients, who may well have been victims of improper medical practices and who not only do not object to use of their records but expressly sanction it."

prior to the pronouncement of a decision does not further compliance with that decision. (*Id.*)" (Fn. omitted.)[3]

■ The trial court applying a balancing test gave careful consideration to the evidence and correctly concluded that *Gherardini* should not be given retroactive application. Accordingly it held the hospital records produced pursuant to valid subpoenas were admissible at the administrative hearing.

## II

■ The Board in its turn contends that the office records were similarly admissible at the administrative proceeding and challenges the trial court's ruling excluding them. The Board first argues that Pating lacks standing to claim a right to object to introduction of the office records of third parties which were voluntarily provided, without subpoena, by Drs. Zalta and Morgan. Pating can prevail only by application of the vicarious exclusionary rule which was first enunciated in *People* v. *Martin* (1955) 45 Cal.2d 755 [290 P.2d 855]. This rule permits a criminal defendant to seek to suppress evidence obtained by the police from a third person on grounds that it resulted from an unreasonable search and seizure. (*Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150 [98 Cal.Rptr. 649, 491 P.2d 1].) In *Kaplan* it was held that defendant on a Penal Code section 1538.5 motion could suppress evidence obtained by police officers from the unreasonable search of a third person during a vehicle stop. The trial court on the dubious authority of *Kaplan* applied the vicarious exclusionary rule of criminal cases, upheld Pating's challenge and excluded the office records obtained from Drs. Zalta and Morgan.

The *Kaplan* decision is distinguishable not only because it applies rules enunciated in and generally limited to criminal cases, but also be-

---

[3]In accord on the issue of retroactivity is *Hernandez* v. *Superior Court* (1980) 110 Cal.App.3d 355 [185 Cal.Rptr. 127]. The appellate court in that case rejected the retroactive application of a decision subsequent to *Burrows*. (*People* v. *Blair* (1979) 25 Cal.3d 640 [159 Cal.Rptr. 818, 602 P.2d 738].) The court expressed its reasons as follows: "The seminal case of *Burrows* v. *Superior Court, supra,* turned on whether a bank customer entertains 'a reasonable expectation of privacy' in records of his banking transactions in the hands of the bank. *Blair* applies the same test to the credit card holder. However, the fact that the identical test is applied to resolve each case is not dispositive of the issue of retroactivity. 'There is a vast array of possible circumstances in which a person may or may not have a reasonable expectation of privacy. These questions cannot be deemed to be settled merely because the general framework for evaluating them has been established.' (*People* v. *Kaanehe* (1977) 19 Cal.3d 1, 10, fn. 6 . . . .)" (*Hernandez, supra,* 110 Cal.App.3d at p. 362.)

cause there the third party gave no voluntary consent to the use of the evidence. The *Kaplan* court seriously considered and did not reject the potential for retroactive consent to vitiate the illegality of the initial seizure.

In the case at bench, eight of the patients appeared at the hearing and voluntarily, without reward or inducement, consented to the use of all their medical records. It appears that once the patients consented to introduction of their records, Pating was no longer entitled (if ever he had been) to assert their rights under the exclusionary rule.

The Attorney General further argues, reasonably, that having allegedly victimized his patients, Pating should not be permitted standing to thus assert their privacy rights for his own protection. "[A] burglar's right to object to the introduction of evidence seized from third person [citation], does not exist where the third person is one of the burglary's *victims*. In such a case the right of privacy is not violated, it is protected; and 'there is no illegal seizure of which [the burglar] may vicariously complain.' (*People* v. *Solario* (1977) 19 Cal.3d 760, 764 ....)" (*People* v. *Newell* (1979) 93 Cal.App.3d 29, 37 [155 Cal.Rptr. 430].)

Finally, the application of the exclusionary rule has generally been based upon a determination that there was a violation of the Fourth Amendment rights of the person (or third party) to be free of unreasonable searches and seizures by law enforcement officials. Therefore, even if its potential applicability to administrative proceedings may be assumed (see e.g., *Board of Medical Quality Assurance* v. *Gherardini, supra*, 93 Cal.App.3d 669, 676) the threshhold issue is whether there was with respect to the doctors' office records any unreasonable search and seizure in the first place. The facts reflected by the record before this court militate against finding an unreasonable seizure. The trial court based exclusion of the office records in part on the fact that Butler, acting subsequent to *Burrows* but proceeding without either subpoena or patient consent, obtained medical records in which the patients had a reasonable expectation of privacy. (*Burrows* v. *Superior Court, supra*, 13 Cal.3d 238.)

*Burrows* is a case involving a violation of the right to be free of unreasonable searches and seizures (Cal. Const., art. I, § 13) by police officers rather than a case relating to the obtaining of medical records by an administrative investigator in alleged violation of the patients'

constitutional privacy rights. (Cal. Const., art. I, § 1.) Whether the failure of Butler to obtain legal process to obtain these records constituted an unreasonable interference with the patients' expectations of privacy based on their constitutional privacy rights is one of the issues before this court. This court upon a careful consideration of the facts of this case and balancing of the interests involved concludes that there was no unreasonable invasion of the patients' interests in the privacy of their medical records.[4]

The record reveals no facts or circumstances from which it might reasonably be inferred that Butler had cause to believe there was any impropriety in connection with his procurement of the doctors' office records. The Board initiated a formal investigation in this case to follow up a report of suspension of Pating's staff privileges which was filed by Foothill Hospital pursuant to the requirements of Business and Professions Code section 805. Butler was assigned the case and undertook to contact the hospital where Drs. Morgan and Zalta had successively occupied the position of chief of staff.

By the time Butler visited Foothill Hospital, Drs. Zalta and Morgan had assembled substantial information relating to Pating's alleged misconduct which constituted grounds for suspension of his staff privileges. As it turned out these doctors had been associated in business with Pating as part of the Medical Group and after he terminated his association they continued to practice with the Medical Group. Despite the fact that the named patients had gone to various hospitals for treatment, each was seen by Pating during the period in question, and their files remained with the Medical Group. The doctors continued to see a couple of these patients at the Medical Group.

The doctors presented Butler on his visit to Foothill Hospital with case summaries pertaining to the patients named in the accusation. As the summaries show, Drs. Zalta and Morgan previous to Butler's visit had examined some of these patients and compared the examination results with the entries made by Pating. On the basis of their examination

---

[4]Although Pating in his pleadings challenged the disclosure of information from both hospital and office records on the basis of the physician-patient privilege, he has apparently abandoned that position on appeal. It is clear that the statutory exception to the privilege provided for records obtained for the purpose of administrative hearings of a disciplinary nature is applicable here. (See, e.g., Evid. Code, § 1007; Bus. & Prof. Code, § 2379 enacted in 1937 now contained in §§ 2225 and 2263.) The consents of the patients who are the statutory holders of the privilege would validate the conduct of the investigator and the doctors in any event under these principles.

of records in the possession of the Medical Group they concluded that Pating had engaged in professional misconduct as variously enumerated in the case summaries. They concluded, inter alia, that certain surgeries were not needed, that operative reports were inaccurate, and that billings had been submitted for services not rendered.

As is readily apparent from these facts Drs. Zalta and Morgan were not in a position analogous to that of a neutral entity which holds as custodian the medical records of third parties. They were intimately involved in the case and as former medical practice associates of Pating they were potential victims whose reputations were at stake. Each had professional and personal interests in assuring that facts were made available to the Board to vindicate their practice and to discipline Pating. In addition both were associated with Foothill Hospital where Dr. Morgan was chief of staff at the time Pating's privileges were suspended. The hospital was required to report the facts and circumstances regarding the suspension. (Bus. & Prof. Code, § 805.) It may reasonably be inferred that the doctors had a duty to cooperate to the fullest in the Board's investigation as well as the authority to make available all facts and supporting evidence surrounding the suspension of Pating's staff privileges.

In *Burrows* the court noted that the bank; "a detached and disinterested entity;" held very private records which it relinquished voluntarily at police request. The court concluded that to permit the police access to such records without any judicial control as to relevancy and to permit the evidence to be used in a subsequent criminal proceeding opened the door to very real abuses of police power. That rationale is inapplicable in the case at bench where the doctors volunteered, possibly even without a formal request by Butler, the records of persons who had been or were currently patients at the Medical Group in which the doctors were associated in practice and where Pating had formerly been associated.

Furthermore we take note that, although cases relating to unreasonable search and seizure have been argued by the parties, both conceded that this is not in essence a Fourth Amendment or California Constitution article I, section 13 case. Therefore, while these cases are informative they are not controlling. As the Attorney General points out the exclusionary rule where considered has generally been held inapplicable in administrative proceedings which are characterized as civil rather than criminal in nature. (See, e.g., *Camacho* v. *Youde* (1979) 95

Cal.App.3d 161, 164 [157 Cal.Rptr. 26]; *Brown* v. *State Department of Health* (1978) 86 Cal.App.3d 548, 556 [150 Cal.Rptr. 344].) Despite dicta in *Gherardini*, we have been referred to no judicial decision which has even considered the applicability of the extension of this principle, the assertion of the rights of third parties through the vicarious exclusionary rule, in administrative proceedings.

The exclusionary rule has specifically been held inapplicable to an attorney disciplinary proceeding. (*Emslie* v. *State Bar* (1974) 11 Cal.3d 210 [113 Cal.Rptr. 175, 520 P.2d 991].) The court then concluded that the purpose of the exclusionary rule is not fulfilled in most instances where it might be applied in disciplinary proceedings. "The exclusionary rules of the criminal law are based upon the principle that the state should not profit by its own wrong in using in criminal proceedings evidence obtained by unconstitutional methods; and upon the premise that by denying any profit to law enforcement officers who may be tempted to use illegal methods to obtain incriminating evidence (i.e., by not allowing the use of such evidence at the trial), the rules will have a deterrent effect. (See *People* v. *Moore* (1968) 69 Cal.2d 674, 682 [72 Cal.Rptr. 800, 446 P.2d 800]; *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 763-764 [44 Cal.Rptr. 313, 401 P.2d 921].)" (*Emslie* v. *State Bar, supra*, 11 Cal.3d 210, 226-227.)

The *Emslie* court declared that "a balancing test must be applied in such proceedings and consideration must be given to the social consequences of applying the exclusionary rules and to the effect thereof on the integrity of the judicial process." (*Id.*, at p. 229.) Accordingly the court observed that the application of such rules must be worked out on a case-by-case basis in license revocation proceedings.

Applying the balancing test to the case at bench we find insufficient grounds for extending the exclusionary rule from criminal cases to this administrative investigation undertaken to insure that the public enjoys the benefits of a high quality of medical practice. (See e.g., *Shea* v. *Board of Medical Examiners* (1978) 81 Cal.App.3d 564, 574 [146 Cal.Rptr. 653].) In the case at bench the public is entitled on the one hand to the protection of its physical well-being which is threatened by alleged acts of gross negligence or incompetence of a medical practitioner. Balanced against this must be the deterrent effect of the exclusionary rule designed to control the conduct of law enforcement officers, to keep the court from being an unwilling participant in such conduct, and to insure the reliability of evidence. The trial court found

on the evidence that the investigator engaged in no deliberate misconduct in obtaining the office medical records, and that he proceeded in good faith. Nonetheless the court concluded that by receiving or obtaining the office records volunteered by the doctors without obtaining a subpoena Butler violated the patients' rights to privacy on the authority of *Burrows.*

In view of the good faith of Butler, well established by the evidence in the record, there is no logic in applying the exclusionary rule for its preventive or deterrent effect. (*People* v. *Newell, supra,* 93 Cal.App.3d 29, 38-39.) It appears that had Butler foreseen the possibility that a trial court might suppress evidence thus obtained he would have proceeded to utilize a subpoena as he did in respect to the hospitals which were neutral record custodians. However, as we have previously noted, it could not be reasonably anticipated by Butler or the Board that the principles enunciated in *Burrows,* a criminal case, would be applied to their administrative investigations. The exclusionary rule has previously been applied by the California Supreme Court only in proceedings where the subject has a close identity to the aims and objectives of criminal law enforcement. (See e.g., *Emslie* v. *State Bar, supra,* 11 Cal.3d 210; *People* v. *Moore* (1968) 69 Cal.2d 674, 682 [72 Cal.Rptr. 800, 446 P.2d 800]; *People* v. *One 1960 Cadillac Coupe* (1964) 62 Cal.2d 92 [41 Cal.Rptr. 290, 396 P.2d 706].) This court has also refused to apply the exclusionary rule retroactively even in criminal proceedings where the facts appear to be sufficiently dissimilar so that the application of the rule could not reasonably be foreseen. (*Hernandez* v. *Superior Court, supra,* 110 Cal.App.3d 355.) A fortiori, the applicability of the rule derived from bank records obtained by police in *Burrows* to the office medical records here obtained by an administrative investigator could not reasonably be anticipated.

In balancing the interests and various concerns involved we conclude that the scales are weighted heavily against the application of the exclusionary rule in the case at bench. Pating seeks to rely on the alleged constitutional rights of his former patients to their privacy, but is silent with respect to their rights to be free of potentially health or life-threatening misconduct or negligence on the part of their doctor. Given the option, the eight patients who testified elected to waive the rights to privacy and physician-patient privilege and gave express and unequivocal consent to the introduction of all of their medical records.

In view of the foregoing we need not address the Board's final argument with respect to the inevitable discovery doctrine. (*People* v. *Superior Court (Tunch)* (1978) 80 Cal.App.3d 665 [145 Cal.Rptr. 795].)

## DISPOSITION

The judgment is affirmed insofar as it holds the hospital records admissible. It is reversed insofar as it holds the office medical records of the named patients inadmissible in evidence with instructions to the trial court to enter judgment in accord with the opinions expressed herein.

Defendants-appellants to recover costs.

Lillie, Acting P. J., and Dalsimer, J., concurred.

A petition for a rehearing was denied May 11, 1982, and the petition of plaintiff and appellant for a hearing by the Supreme Court was denied June 9, 1982.