[Civ. No. 24263. Fourth Dist., Div. One. Apr. 5, 1983.]

JAMES DEWITT DOUGLASS, Plaintiff and Respondent, v.
BOARD OF MEDICAL QUALITY ASSURANCE,
Defendant and Appellant.

COUNSEL

George Deukmejian, Attorney General, Alvin J. Korobkin and Barry D. Ladendorf, Deputy Attorneys General, for Defendant and Appellant.

James A. Stotler and Stotler & Stotler for Plaintiff and Respondent.

OPINION

WIENER, J.—Defendant Board of Medical Quality Assurance (BMQA) appeals from the judgment in favor of plaintiff James Dewitt Douglass, a licensed medical doctor. In challenging the judgment arising from two distinct courses of conduct by Douglass reflected in BMQA's accusation filed in April 1978 and a supplemental accusation filed in January 1979, BMQA asks us to define the parameters of official conduct with respect to an entrapment defense and to decide the admissibility of hearsay evidence which forms the basis for an expert's opinion the physician acted unprofessionally. We conclude there is insufficient evidence to support the trial court finding of entrapment pertaining to the charges of the April 1978 accusation and therefore reverse the judgment on that accusation. We also decide the court prejudicially erred in ruling certain documentary evidence was hearsay and consequently reverse and remand to allow the court to reweigh the evidence.

FACTUAL AND PROCEDURAL BACKGROUND

BMQA first accused Douglass of unprofessional conduct (former Bus. & Prof. Code, § 2361, subd. (a), current § 2234, subd. (a))[1] in April 1978 alleging he failed to conduct good faith prior examinations (former § 2399.5, current § 2242, subd. (a)) and prescribed excessive amounts of drugs (former § 700, current § 725). In January 1979, BMQA filed a supplemental accusation alleging Douglass prescribed controlled substances without performing good faith prior examinations (former § 2399.5, current § 2242, subd. (a)). While the accusations were consolidated at the administrative hearing and have remained procedurally a single lawsuit, except for Douglass' involvement the facts on which BMQA relied in each accusation are unrelated to the facts of the other. The legal issues are also distinct and accordingly we shall discuss them separately.

---

[1]All statutory references are to the Business and Professions Code unless otherwise specified.

*The Administrative Proceeding*

*Facts—The Initial Accusation*

The administrative hearing over which an administrative law judge (ALJ) presided was held in February 1979. BMQA introduced evidence through the testimony of three BMQA agents and an expert witness to support its first accusation Douglass acted unprofessionally.

Agent Simpson visited Douglass' office and filled out two patient history forms after telling the nurse she had a sore throat. The nurse's record of Simpson's first phone call requesting an appointment indicated she had a backache. A nurse interviewed Simpson, weighed her and took her blood pressure, noting this information in Simpson's chart. Simpson said Douglass saw her for five to seven minutes, discussed horse riding accidents and broken bones, and told him she had been under the care of a San Francisco physician who had prescribed Preludin. She asked Douglass to prescribe that drug for her; he did so.[2]

Simpson returned four more times to Douglass' office. Her blood pressure was taken on each occasion; she was weighed three times. In making her second appointment, Simpson told the receptionist she had a virus. At the office, however, she told the nurse she wanted a Seconal refill. The nurse wrote "sleeping pills" in her chart. Douglass came into the room, looked at the chart, and prescribed Seconal.

Simpson's third, fourth, and fifth visits lasted about five minutes each. At the third, she requested refills of both Preludin and Seconal but Douglass prescribed only the Seconal. On her fourth visit, Douglass prescribed the Preludin refill. On her final visit, Douglass prescribed a Seconal refill after Simpson requested it.

Agent Dalton saw Douglass three times. Simpson had set up Dalton's appointment by telling the receptionist Dalton suffered from weight problems. At her first visit, Dalton filled out both patient history forms and told the nurse she

---

[2]Douglass prescribed the following to Simpson:

| | |
|---|---|
| August 4, 1977 | 30 Preludin (50 mg.) |
| August 16, 1977 | 60 Seconal (1.5 gr.) |
| September 16, 1977 | 60 Seconal (1.5 gr.) |
| September 27, 1977 | 30 Preludin (50 mg.) |
| October 7, 1977 | 60 Seconal (1.5 gr.) |

had a cold. A nurse took Dalton's blood pressure, temperature, weighed her, and wrote this information in her chart. During her five-minute visit with Douglass, she told him she had been receiving either Preludin or Biphetamine from a physician "up north." In response to his question about her weight, she replied she took the drugs not for weight problems but to get her going early in the morning. Douglass refused to prescribe Biphetamine but prescribed Preludin and told Dalton not to sell it because it was hard to come by.[3] Douglass said he kept his in a strongbox at home. On her second visit, Dalton told the nurse she wanted refills of Seconal or Quaalude prescriptions she had obtained from another doctor. She told Douglass she wanted Quaaludes because she liked the way they made her feel. Douglass told her Quaalude is the number one choice of the drug set, but he could only prescribe a small number because the police watch Quaalude closely. He also wrote out a prescription for Preludin. Her final visit lasted five minutes. After looking in her chart, Douglass prescribed both Quaalude and Preludin.

Agent Miller saw Douglass twice. He filled out both patient history forms and told the nurse he wanted a checkup. A nurse took his blood pressure and weighed him. Douglass then saw him for about 15 minutes. They discussed items on Miller's chart and Douglass asked him about his previous illnesses. Miller said he needed something to get him going in the mornings and mentioned he had on occasion taken friends' Preludin tablets. Douglass said Preludin was a restricted drug and he could not write a prescription for it. He instead wrote one for Dexamyl.[4] Douglass then listened to Miller's heart and lungs and took his blood pressure. Miller's second visit lasted five minutes. He asked Douglass for something stronger and Douglass wrote a prescription for Dexedrine.

Dr. Matthew J. Ellenhorn, a medical doctor, testified as BMQA's expert. He stated in his opinion a physician should personally spend 20-30 minutes with a patient on an initial visit. Although the physician need not conduct an extensive examination, the initial examination should include an extensive patient

---

[3]Douglass prescribed the following to Dalton:

| September 16, 1977 | 30 Preludin (75 mg.) |
| September 27, 1977 | 30 Quaalude (300 mg.) |
| September 27, 1977 | 30 Preludin (75 mg.) |
| October 24, 1977 | 30 Quaalude (300 mg.) |
| October 24, 1977 | 30 Preludin (75 mg.) |

[4]Douglass prescribed the following to Miller:

| October 13, 1977 | 40 Dexamyl (5 mg.) |
| November 3, 1977 | 100 Dexedrine (5 mg.) |

history,[5] a physical examination,[6] and laboratory work.[7] In response to hypothetical questions posed to him by BMQA's counsel, Ellenhorn concluded Douglass did not conduct good faith prior examinations in 9 of the 10 situations posed by counsel.[8] He also concluded in all 10 instances Douglass prescribed controlled substances which were not medically indicated.[9] He also opined Douglass' conduct constituted clearly excessive prescribing of drugs. He observed there was no medical indication for a physician's prescribing a stimulant and a sedative to a single patient at the same time, as Douglass did for Dalton on her second and third visits. Ellenhorn testified Preludin, Dexedrine, and Dexamyl were used to treat obesity. The ALJ asked him whether women apparently the age, height, and weight of Agents Simpson and Dalton were obese. Ellenhorn responded they were not. He also said a physician should not prescribe any weight reduction medication to such women even though they wished to lose several pounds. Ellenhorn admitted physicians could not always determine objectively the causes of a patient's symptoms and would have to consider the patient's subjective complaints. In particular, he concluded the physician may not be able to make objective findings for a patient's insomnia and might prescribe as many as 10 Seconal for an undiagnosed sleeping problem to help the patient. Ellenhorn also admitted the physician should rely on what his staff places into the patient's medical record.

Louise Knott, Douglass' receptionist, was the final witness. She testified she received phone calls from patients making appointments and stating their com-

---

[5]The patient's history includes the complaint which brought him to the doctor; his past medical history, including diseases, operations and accidents; his habits such as smoking, drug or alcohol use, sleeping, or eating; his family's medical history; and a systems review consisting of an inquiry into the patient's various organ systems, such as the eyes, ears, throat, lungs, abdomen, etc.

[6]The physical examination consists of a physical or instrumental examination by the physician of the patient's head (including scalp, eyes, nose, mouth and tongue), neck (including its mobility and tumors, the thyroid, and lymph nodes), chest (including its size, expansion and expiration, the lungs, and the heart), abdomen (including obesity, and the liver, kidney, and spleen), genitourinary organs (including a rectal examination and a pelvic examination for women and prostate examination for men), and the neurological system (including cranial nerves and tendon reflexes).

[7]The laboratory work requires, at a minimum, a urinalysis and a blood count.

[8]Ellenhorn did not reach a conclusion on what is obviously Agent Miller's initial visit. From the transcript, however, it is clear BMQA's attorney simply failed to ask this question.

[9]According to Ellenhorn, an indication is the ". . . summary of facts upon which the doctor bases a certain working conclusion which renders it possible for him to render medical treatment to the patient which will directly and beneficially affect the patient's status for which he sought the doctor's attention originally." The legal definition of medical indication is ". . . existence of symptoms or the presence of satisfying evidence which suggests to a doctor the need or advisability for prescribing the use of a dangerous drug." (*Sunseri* v. *Board of Medical Examiners* (1964) 224 Cal.App.2d 309, 313 [36 Cal.Rptr. 553], overruled on another ground in *Kirby* v. *Alcoholic Bev. etc. Appeals Bd.* (1970) 8 Cal.App.3d 1009, 1020 [87 Cal.Rptr. 908].)

plaints. She wrote down these complaints in the patients' charts. Douglass did not testify.[10]

*Facts—The Supplemental Accusation*

BMQA relied primarily on documentary evidence to support the allegations of the second accusation. This accusation concerned Douglass' prescribing controlled substances to Joseph Scolaro on 17 occasions during a 3-month period in 1978.[11] These documents consisted of photocopies of the prescriptions obtained from pharmacies where Scolaro had them filled and the medical records BMQA obtained from Douglass' office pursuant to a search warrant. BMQA introduced the documents through the testimony of David T. Thornton, a BMQA investigator. He obtained the prescriptions from the pharmacies in the course of his duties as an investigator. The record is silent whether Thornton presented a subpoena or simply asked each pharmacy for the prescriptions. Thornton went to Douglass' office with a search warrant to get the Scolaro file. The record contains the search warrant Thornton used to obtain the Scolaro file but the affidavit on which the court issuing the warrant relied is absent.[12] At Douglass' office Thornton identified himself and showed the receptionist the warrant. He told her he wanted Douglass' records on Joseph Scolaro, watched her go to a file cabinet, remove a file and give it to him. He asked her whether this file was everything kept on Scolaro and she responded it was. He then gave her a copy of the search warrant and left.

---

[10]BMQA could have called Douglass as a witness but apparently did not because Douglass' attorney informed BMQA's counsel Douglass would assert his privilege against self-incrimination.

[11]Douglass prescribed the following to Scolaro:

| April 4, 1978 | 40 Percodan |
|---|---|
| April 7, 1978 | 50 Percodan |
| April 13, 1978 | 50 Percodan |
| April 26, 1978 | 50 Percocet 5 |
| April 26, 1978 | 30 Quaalude (300 mg.) |
| April 29, 1978 | 50 Percodan |
| May 5, 1978 | 50 Percodan |
| May 9, 1978 | 50 Percodan |
| May 12, 1978 | 30 Percodan |
| May 25, 1978 | 50 Percodan |
| May 25, 1978 | 30 Quaalude (300 mg.) |
| June 5, 1978 | 100 Percodan |
| June 12, 1978 | 20 Percodan |
| June 12, 1978 | 60 Quaalude (300 mg.) |
| July 6, 1978 | 40 Percodan |
| July 12, 1978 | 50 Percodan |
| July 12, 1978 | 60 Quaalude (300 mg.) |

[12]Although BMQA has the authority to issue a subpoena duces tecum to investigate and prosecute an action concerning subjects under its jurisdiction (see Gov. Code, §§ 11180-11191), BMQA and the district attorney were conducting a criminal investigation of Douglass and obtained the warrant from the municipal court.

Dr. Ellenhorn also testified with respect to the Scolaro accusation. He stated he reviewed the record and concluded for the majority of the 17 instances Douglass had prescribed controlled substances where there was no medical indication to do so.

### The Decision by the Administrative Law Judge

The ALJ issued his proposed decision in March 1979. Rejecting Douglass' entrapment contention, he found Douglass prescribed the drugs alleged to Agents Simpson, Dalton and Miller without conducting good faith prior examinations. He also found Douglass' conduct to be clearly excessive prescribing of drugs. The ALJ also determined BMQA failed to establish Douglass had prescribed drugs to Scolaro without conducting good faith prior examinations. He believed because Ellenhorn had no knowledge or information regarding Scolaro other than documents introduced at the hearing, he did not know what Scolaro's actual conditions were, what Douglass' recording methods were, and what may have transpired during the office visits. He ordered the Scolaro accusation dismissed.

The ALJ recommended revoking Douglass' license with the revocation stayed for five years subject to certain probation conditions.

### The Decision by BMQA

Following proper procedures, BMQA did not adopt the ALJ's decision. Although it agreed Douglass violated current sections 2234, subdivision (a), 2242, subdivision (a), 725 and section 11154 of the Health and Safety Code regarding his prescription of drugs to Agents Simpson, Miller, and Dalton, it rejected the ALJ's findings pertaining to Scolaro. Finding Douglass guilty of those charges also (§§ 2242, subd. (a), 725), BMQA revoked his license, but on more severe conditions. The revocation order was stayed and Douglass was placed on probation for 10 years, including a 90-day suspension, and required to take and pass an oral clinical examination before resuming the practice of medicine. Douglass was also prohibited from prescribing, administering or dispensing controlled substances except certain drugs specifically delineated.

### The Superior Court Proceedings

Douglass then sought mandamus in the superior court arguing entrapment, evidentiary considerations, and due process requiring reversal of BMQA's order. The superior court concluded BMQA's agents had entrapped Douglass and the Scolaro evidence was inadmissible. This appeal by BMQA followed.

# I

## ENTRAPMENT

■ An entrapment defense may be raised in an administrative proceeding against a physician where his license may be suspended or revoked. (*Patty v. Board of Medical Examiners* (1973) 9 Cal.3d 356, 367 [107 Cal.Rptr. 473, 508 P.2d 1121, 61 A.L.R.3d 342].) ■ In reviewing a decision by the administrative agency, the superior court must examine the entire record and exercise its independent judgment upon the evidence. (*Id.*, at p. 367, fn. 10; *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481 P.2d 242].) When the trial court's judgment is supported by substantial evidence we must affirm. (*Patty* v. *Board of Medical Examiners, supra,* 9 Cal.3d at pp. 367-368, fn. 10; *Bixby* v. *Pierno, supra,* 4 Cal.3d at p. 143, fn. 10.)

■ Entrapment constitutes ". . . the conduct of the law enforcement agent [that] was likely to induce a normally law-abiding person to commit the offense[.]" (*People* v. *Barraza* (1979) 23 Cal.3d 675, 689-690 [153 Cal.Rptr. 459, 591 P.2d 947].) Differing from the federal standard which requires a showing the defendant was not predisposed to commit the offense (see, e.g., *United States* v. *Russell* (1973) 411 U.S. 423 [36 L.Ed.2d 366, 93 S.Ct. 1637]), and unlike the earlier California schizophrenic approach (see *People* v. *Barraza, supra,* 23 Cal.3d at p. 688), the current California test focuses on the law enforcement agent's conduct examined in light of the circumstances surrounding the situation in question. (*Id.*, at p. 690.) The suspect's predisposition to commit the offense and his subjective intent are irrelevant. (*Id.*, at pp. 690-691.) Undercover operations and decoys are permissible provided the police agents do not resort to pressure or overbearing conduct "such as badgering, cajoling, importuning, or other affirmative acts" (*id.*, at p. 690) to induce the criminal act. If the police generate ordinary criminal intent, however, the agent's conduct does not constitute entrapment. (*Ibid.*) An individual is presumed to resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. (*Ibid.*) Appeals to friendship or sympathy, or representations or enticements making the act unusually attractive, are impermissible. (*Ibid.*)

■ Here the court found ". . . the intent to engage in unprofessional conduct originated in the mind of the . . . agents and [Douglass'] conduct . . . was realized through allurements, inducements and persuasions and the conduct of the . . . agents was likely to induce a normally law-abiding person to engage in unprofessional conduct . . . ." If these findings are factual determinations based upon the evidence, we are obligated to affirm the judgment. Our search of the record, however, fails to reveal the evidence from which these findings are drawn. The "findings" do not indicate what BMQA's agents did or in what manner they conducted themselves to set up Douglass. The court incorporated

the facts as portrayed in the record and concluded entrapment occurred.[13] Although in the absence of findings we must make all reasonable inferences in support of upholding the court's decision (*Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 72 [64 Cal.Rptr. 785, 435 P.2d 553]; *Lacy* v. *California Unemployment Ins. Appeals Bd.* (1971) 17 Cal.App.3d 1128, 1134-1135 [95 Cal.Rptr. 566]), we are unable to do so here. It is our responsibility to examine the court's legal conclusion against the facts taken in the light most favorable to the judgment. Where there is simply no evidence revealing entrapment, however, we cannot uphold the court's decision.

■ The evidence presented reveals a physician quite willing to prescribe dangerous drugs to new patients with only cursory medical examinations. He provided Preludin, Seconal, Quaalude, Dexamyl, and Dexedrine in varying quantities to three "patients" whose complaints included "backache," "virus," "diet," and the "need to get going in the early morning." Once Douglass prescribed Quaaludes to an agent because she liked the way they made her feel. On several occasions, the agents simply requested specific drugs. Although Douglass did not always accede to these requests, he unfailingly prescribed some other controlled substance. Certainly the agents lied to Douglass. But *Barraza* does not prevent government agents from lying. "The police remain free to take reasonable, though restrained, steps to gain the confidence of suspects. A contrary rule would . . . tend to limit convictions to only the most gullible offenders." (*People* v. *Barraza, supra,* 23 Cal.3d at p. 690, fn. 4.) Here, the agents' conduct simply provided Douglass the opportunity to engage in unprofessional conduct for the ordinary criminal motive of pecuniary gain. Douglass does not argue the agents "badgered" or "cajoled" him into providing the drugs and there is no evidence they did.

Ellenhorn testified, without contradiction, a physician needed more information than knowledge of the patient's blood pressure and his subjective complaint before prescribing the drugs Douglass provided the agents. He maintained a responsible physician must personally spend 20-30 minutes conducting the initial physical examination. This was in addition to information supplied to the doctor by the nurse and noted in the patient's medical chart. Ellenhorn concluded on each occasion the agents presented Douglass no information representing a medical indication which should be treated by the drugs Douglass prescribed. Thus, according to Ellenhorn, had a physician accepted as true all that the agents told Douglass, he should not have prescribed as he did. Accordingly, there is no evidence the agents entrapped Douglass.

We realize the facts here are similar to those in *Patty* v. *Board of Medical Examiners, supra,* 9 Cal.3d 356. Nevertheless, the *Patty* court emphasized Dr. Patty's naivete (9 Cal.3d at p. 369) and his severe illness (*id.,* at p. 360) and

---

[13]Whether the activities entrapped a defendant is a factual question. (See *People* v. *Barraza, supra,* 23 Cal.3d at p. 691, fn. 6.)

noted the agents were young women while Dr. Patty was an elderly physician. (*Id.*, at p. 369.) Here, there is no indication of the agents' ages or evidence Douglass was suffering from any illness which would cause him to lose his ability to function as a physician. Moreover, Douglass cautioned Dalton not to sell the Preludin he had just prescribed to her because she would only have less of it and it was hard to come by. He said he kept his in a strongbox at his house. He later advised Dalton Quaalude was the number one choice of the drug set and the police watched that drug closely so he could only prescribe a small amount. Douglass was not a naive neophyte who needed to consult with a pharmacist to learn what "whites" or "dexies" were. (Compare, *Patty* v. *Board of Medical Examiners, supra,* 9 Cal.3d at p. 369.) We hold the conduct of the law enforcement agents was not likely to induce a normally law-abiding person to commit the offenses. Thus, the court prejudicially erred in finding entrapment by the BMQA agents.

## II

### Admissibility of Evidence

BMQA challenges the court's ruling "[t]he Scolaro evidence should not have been considered." At the administrative hearing, Douglass tendered six separate grounds against the introduction of the documentary evidence on which Dr. Ellenhorn based his opinion.[14]   (7) ■■ ■ ■ At the superior court, however, Douglass argued the documents were hearsay on which the ALJ could not rely and BMQA had not properly laid the foundation for the introduction of documents.[15] The superior court agreed, finding this evidence inadmissible hearsay and thus insufficient for reaching a decision and concluded BMQA's findings were not supported by the weight of the evidence.

---

[14]Douglass objected to Ellenhorn's testimony concerning the records on the grounds (1) it was hearsay; (2) no foundation as to the records' admissibility had been laid; (3) it assumed facts not in evidence; (4) the questions called for conclusions; (5) no foundation that the records were obtained pursuant to a legal search and seizure had been laid; and (6) it constituted a denial of Douglass' rights to cross-examination and confrontation.

We confront (1) and (2) at pages 658-660 *post*; (3) is in essence identical to (2); (4) is invalid because parties seek expert testimony so the experts will reach conclusions. (See Evid. Code, § 801.) As to (5), the exclusionary rule does not apply in this case. (See *Pating* v. *Board of Medical Quality Assurance* (1982) 130 Cal.App.3d 608, 624-625 [182 Cal.Rptr. 20].) Finally, (6) is a nonsequitur. Douglass had the opportunity to examine Ellenhorn and to introduce evidence the documents were inaccurate, incomplete, or otherwise untrustworthy.

[15]Douglass also argued the administrative proceeding constituted a denial of due process because BMQA acted in an investigatory, prosecutorial, and adjudicatory capacity. The superior court found Douglass' right to due process of law was denied because BMQA acted in an investigatory, prosecutorial, and adjudicatory capacity in considering inadmissible evidence and in increasing Douglass' penalty over that recommended by the ALJ. This finding, more properly a legal conclusion, is incorrect because there is no evidence BMQA acted improperly. (See, e.g., *Withrow* v. *Larkin* (1975) 421 U.S. 35, 46-55 [43 L.Ed.2d 712, 95 S.Ct. 1456]; *Griggs* v. *Board of Trustees* (1964) 61 Cal.2d 93, 98 [37 Cal.Rptr. 194, 389 P.2d 722]; *Feist* v. *Rowe* (1970) 3 Cal.App.3d 404, 411-413 [83 Cal.Rptr. 465].)

■ The standard of review for the evidentiary issues is identical to the standard applied in the entrapment issue. Since Douglass' license could have been suspended or revoked as the result of the administrative proceeding, the superior court properly examined the entire record and exercised its independent judgment upon the evidence. (*Patty* v. *Board of Medical Examiners, supra,* 9 Cal.3d at pp. 367-368, fn. 10; *Bixby* v. *Pierno, supra,* 4 Cal.3d at p. 143.) We must make all reasonable inferences in support of upholding the court's decision (*Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.3d at p. 72; *Lacy* v. *California Unemployment Ins. Appeals Bd., supra,* 17 Cal.3d at pp. 1134-1135) and must affirm the judgment if it is supported by substantial evidence. (*Patty* v. *Board of Medical Examiners, supra,* 9 Cal.3d at pp. 367-368, fn. 10; *Bixby* v. *Pierno, supra,* 4 Cal.3d at p. 143, fn. 10.)

All relevant evidence is admissible at administrative hearings provided it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs. (Gov. Code, § 11513, subd. (c).) Hearsay evidence can only supplement or explain other evidence; the decisionmaker may not rely on hearsay alone except when the evidence could be admitted as an exception to the hearsay rule in a civil action. (*Ibid.*)

■ BMQA strenuously argues, because the rules of evidence do not apply in administrative hearings, the ALJ correctly permitted it to introduce the documents. Moreover, BMQA maintains these documents are statements by Douglass and qualify under the party admission exception to the hearsay rule.[16]

■ The records here, out-of-court statements purportedly made by Douglass,[17] constitute hearsay. Douglass incorrectly argues the ALJ improperly permitted BMQA to introduce the documents before it laid a foundation to authenticate them. A trial court has the discretion to control the order of testimony and the introduction of evidence. (Code Civ. Proc., § 607; *McLellan* v. *McLellan* (1972) 23 Cal.App.3d 343, 353 [100 Cal.Rptr. 258].) In a civil trial, a court could allow potentially inadmissible evidence to be introduced subject to the opponent's motion to strike if the proponent of the evidence was unable to lay a foundation for the evidence. (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40, fn. 7 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].) Because administrative hearings are less formal than civil trials (see generally, Gov. Code, § 11513), the ALJ certainly would have the same discretion to control the order of evidence and testimony in an ad-

---

[16]The records do not qualify under the business record exception (Evid. Code, §§ 1270-1272) because no qualified witness testified to the documents' identities and modes of preparation. (Evid. Code, § 1271, subd. (c); see Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 4.1, pp. 210, 226-228.)

[17]Written expressions are statements within the meaning of the Evidence Code. (Evid. Code, § 225.)

ministrative hearing (cf. *Ehrlich* v. *McConnell* (1963) 214 Cal.App.2d 280, 287 [29 Cal.Rptr. 283]). There is no question the ALJ properly permitted BMQA to introduce the documents and Ellenhorn's testimony subject to its laying a foundation after Ellenhorn testified.

■ Moreover, BMQA laid an adequate foundation to permit the ALJ to receive both the records and prescriptions into evidence. Although BMQA could have more efficiently done so by complying with the business records certification process (Evid. Code, § 1560 et seq.), Thornton's testimony provides all the information necessary to authenticate the documents.

To authenticate a writing the proponent must introduce evidence permitting the factfinder reasonably to find the writing is what the proponent claims it to be. (See Evid. Code, § 1400; Jefferson, Cal. Evidence Benchbook, *supra,* § 30.1, p. 1049.) Here, Thornton served a valid search and seizure warrant on Douglass' receptionist. She turned over a file she claimed was the material the warrant specified. The documents came from a file in Douglass' office and contained several items other than the record of Scolaro's office visits, including lab reports addressed to Douglass and letters from other doctors addressed to Douglass. Although this might not prove Douglass wrote the material in the file BMQA alleged he did, it was evidence which would permit the factfinder to find Douglass did. Thus, the records were correctly received as evidence.

The analysis is the same for the prescriptions. Although the record does not reveal how Thornton obtained the prescriptions, we note a pharmacist must retain extensive records of dangerous drug sales and is subject to criminal prosecution if he fails to produce these records to a BMQA investigator. (§ 4232.) We think it reasonable to assume Thornton told the pharmacists of his position with BMQA, that he was conducting an investigation, and requested they provide him with the prescriptions.

In this manner Thornton validly acquired numerous prescriptions having Douglass' purported signature. The fact the prescriptions were signed by Douglass on prescription forms containing his name printed on the top may be sufficient to authenticate the prescriptions. (See Evid. Code, § 1421.) Further, the pharmacist has professional responsibilities and relied on the validity of Douglass' signature. (Cf. *People* v. *Jack* (1965) 233 Cal.App.2d 446, 453-458 [43 Cal.Rptr. 566].) As with the records from Douglass' office, this was sufficient to permit the ALJ to determine whether Douglass actually wrote them.

■ The prescriptions Douglass wrote are his statements (Evid. Code, § 225) and would be admissible in a civil action against him as a party admission. (Evid. Code, § 1220.) Those matters in Scolaro's medical records written by Douglass qualify under this provision as well. Those items written in reports

by Douglass' medical personnel would also qualify as vicarious admissions under Evidence Code section 1224. (See *Labis* v. *Stopper* (1970) 11 Cal. App.3d 1003 [89 Cal.Rptr. 926].) We therefore hold the court prejudicially erred in rejecting this evidence.

## DISPOSITION

Judgment reversed for further proceedings consistent with this opinion.

Brown (Gerald), P. J., and Butler, J., concurred.

A petition for a rehearing was denied April 26, 1983, and respondent's petition for a hearing by the Supreme Court was denied June 15, 1983.