[Civ. No. 30652. Fourth Dist., Div. Three. Dec. 10, 1984.]

GORDON J., JR., a Minor, etc., et al., Plaintiffs and Appellants, v.
SANTA ANA UNIFIED SCHOOL DISTRICT et al.,
Defendants and Respondents.

## COUNSEL

Robert Salisbury and Stephen Johnson for Plaintiffs and Appellants.

Ronald D. Wenkart, James P. Aynes, Maurer, Higginbotham & Harris and O. Brandt Caudill, Jr., for Defendants and Respondents.

## OPINION

**CROSBY, J.**— Is the exclusionary rule applicable in high school disciplinary proceedings? No.

### I

After a hearing before the school board, Gordon J., Jr., was suspended for a year by the Santa Ana Unified School District for possession of mar-

ijuana on the campus of Saddleback High School in late 1982. His appeal to the Orange County Board of Education was denied, as was his petition for writ of mandate in the superior court. This appeal followed.

Gordon was told to turn out his pockets by the vice-principal based on little more than a generalized suspicion evolved from stale information, previous misbehavior, and the student's unusually heavy use of a public telephone. The marijuana was found in the one pocket he omitted to empty, and Gordon was then turned over to a police officer assigned to the school.

Although a manual supplied to students in the district states campus searches will only be undertaken on probable cause, the record before us does not justify this search on that standard, at least as it might be applied to a warrantless search by a police officer. Nevertheless, even assuming a search by a school vice-principal responsible for discipline is equivalent to a police search, for reasons which follow, we find application of the exclusionary rule inappropriate in this type of proceeding.

## II

■ Initially, the school district suggests the appeal is moot and moves to dismiss. Gordon, we are told, has completed the suspension, is now eligible to return to Saddleback, and has suffered no actual interruption of his academic career because he was permitted to attend a high school in another district all along. Counsel for the minor claims the question is of public importance, likely to recur, and should be resolved in this proceeding since virtually any appeal of a school suspension will be mooted by the time it can be decided.

At oral argument we questioned whether transcripts provided to colleges would contain a record of Gordon's suspension, thus providing a continuing liberty interest in the outcome of the appeal. (See, e.g., *Board of Regents* v. *Roth* (1972) 408 U.S. 564, 573 [33 L.Ed.2d 548, 558-559, 92 S.Ct. 2701].) In a supplemental brief, the superintendent of schools declares that disciplinary records are only forwarded to other secondary schools to which a student might transfer and are routinely destroyed three years after a student leaves the district.

Nonetheless, we have determined to resolve the question on the merits and consequently deny the motion to dismiss. The superintendent's belated assurances do not completely eliminate the possibility of future impact from the disciplinary record. It has apparently been transmitted to a school in a different district, but we are not provided with that district's policy concerning confidentiality of disciplinary records in its files. (See, e.g., *Gins-*

*berg* v. *New York* (1968) 390 U.S. 629, 633, fn. 2 [20 L.Ed.2d 195, 200, 88 S.Ct. 1274].) Additionally, the record could conceivably affect enrollment in another secondary school should Gordon's family choose to relocate.

Moreover, the specific question presented, the role of the exclusionary rule in high school disciplinary proceedings, if any, does appear to be of first impression in this state. As the Supreme Court said in passing on a similar mootness contention in an appeal arising from a high school disciplinary proceeding, "The district preliminarily urges that plaintiff's readmission to school has rendered this appeal moot. Even if that were so, this case comes within the well-recognized qualification to the general rule that where, as here, the appeal presents questions of continuing public interest that are likely to recur, resolution of those issues is appropriate. [Citations.] What process is due a student facing expulsion from a public school is a matter of continuing importance to children in the public school system, school boards, and school administrators." (*John A.* v. *San Bernardino City Unified School Dist.* (1982) 33 Cal.3d 301, 307 [187 Cal.Rptr. 472, 654 P.2d 242].)

### III

In view of the sparse authority arising from high school disciplinary cases involving the Fourth Amendment, we begin by examining the history of the exclusionary rule in criminal and juvenile prosecutions arising from campus searches. A warrantless search of a student's locker based on ample probable cause was upheld in the case of *In re Donaldson* (1969) 269 Cal.App.2d 509 [75 Cal.Rptr. 220], because the court found "the vice principal of the high school not to be a governmental official within the meaning of the Fourth Amendment so as to bring into play its prohibition against unreasonable searches and seizures. Such school official is one of the school authorities with an obligation to maintain discipline in the interest of a proper and orderly school operation, and the primary purpose of the school official's search was not to obtain convictions, but to secure evidence of student misconduct. That evidence of crime is uncovered and prosecution results therefrom should not of itself make the search and seizure unreasonable." (*Id.,* at pp. 511-512; see also *People* v. *Stewart* (1970) 63 Misc.2d 601 [313 N.Y.S.2d 253, 256-257] and cases cited.)

After deciding that public school officials are merely private citizens when they search students suspected of criminal activity, the court proceeded to support its holding on the alternative and sharply contradictory ground that these same private citizens simultaneously act as agents of the state in its role as surrogate parent: "The school stands *in loco parentis* and shares, in

matters of school discipline, the parent's right to use moderate force to obtain obedience . . . ." (*Id.*, at p. 513.)[1]

*Donaldson*'s private citizen rationale has been roundly criticized: "The court's theory is quite inscrutable. A vice-principal of a high school obviously exercises the power of the state when he performs the duties assigned to him. Although it is possible for any government employee to act privately, the facts reported in the case completely belie any notion that the challenged search was undertaken by the vice-principal in his individual capacity. In fact, most of the court's opinion is devoted to various justifications of the vice-principal's action *because* he was acting in his official capacity: sharing the authority of the master key to all student lockers, insuring the protection of all students, preserving the law-and-order atmosphere necessary for the educational process, and partaking of the school's *in loco parentis* power." (Buss, *The Fourth Amendment and Searches of Students in Public Schools* (1974) 59 Iowa L.Rev. 739, 766, fns. omitted.) The private citizen theory has also been repeatedly rejected in other jurisdictions. (See, e.g., *Horton* v. *Goose Creek Independent School District* (5th Cir. 1982) 690 F.2d 470, 480 and cases cited.)

*Donaldson* was followed by *In re Thomas G.* (1970) 11 Cal.App.3d 1193 [90 Cal.Rptr. 361], where a high school dean of students, with good reason to believe a minor was in possession of dangerous drugs and narcotics and intended to use them, required him to turn out his pockets. One of the items found was a film canister containing amphetamine pills. The court upheld the search on three grounds: (1) The dean's source was analogous "to a citizen-informer reporting a crime to the police" (*id.*, at p. 1196); (2) "*school authorities* 'may impose more stringent regulations upon the constitutional rights of minors than upon those of adults'" (*id.*, at p. 1198, quoting *Myers* v. *Arcata etc. School Dist.* (1969) 269 Cal.App.2d 549, 558 [75 Cal.Rptr. 68]); and (3) *Donaldson*'s private citizen theory (*id.*, at pp. 1198-1199). The first reason, the reliable tip, combined with the exigent circumstance that the suspected student was expected to consume all or part of the contraband, was probably sufficient justification for a warrantless search under standards applicable to police officers. There was little need to say more. (*In re Guillermo M.* (1982) 130 Cal.App.3d 642, 647 [181 Cal.Rptr. 856].)

---

[1]*Donaldson* is generally characterized as a private citizen search case (see *People* v. *Mangiefico* (1972) 25 Cal.App.3d 1041, 1048 [102 Cal.Rptr. 449], *People* v. *Baker* (1970) 12 Cal.App.3d 826, 834 [96 Cal.Rptr. 760], and cases discussed below); but the Supreme Court on one occasion made a backhanded indorsement of the search of Donaldson's locker on a wholly different theory, "implied consent," although neither word appears in the *Donaldson* opinion (*People* v. *McGrew* (1969) 1 Cal.3d 404, 411-412 [82 Cal.Rptr. 473, 462 P.2d 1], overruled in *People* v. *McKinnon* (1972) 7 Cal.3d 899 [103 Cal.Rptr. 897, 500 P.2d 1097]).

*In re Fred C.* (1972) 26 Cal.App.3d 320 [102 Cal.Rptr. 682] extends the private citizen theory "to a point of ultimate absurdity . . . ." (Buss, *supra,* 59 Iowa L.Rev. at p. 767.) There, two vice-principals confronted a minor who had been expelled from class. They had determined to interview and search him based on information of unproven reliability that the boy had been selling dangerous drugs on campus that morning. When he refused an order to turn out his pockets, they called in a police officer who obtained a "consent" to search after telling the minor he would be searched anyway. Fred's bulging pockets yielded marijuana and dangerous drugs packaged for sale.

It is difficult to disagree with Professor Buss' evaluation of the *Fred C.* opinion: "The [Court of Appeal] indicated that the police officer was not acting in a police capacity but was acting as the agent of the vice-principals who were—of course—characterized as acting in their private capacity although they were obviously acting within the permissible scope of their duties. That sort of turning reality on its head clearly defies further comment." (*Ibid.,* fns. omitted.)

*Fred C.* was succeeded by *In re Christopher W.* (1973) 29 Cal.App.3d 777 [105 Cal.Rptr. 775], where an assistant principal of a high school searched a school locker after he was told by four different students that it contained marijuana. After reviewing *Donaldson* and *Fred C.,* the court turned to a formula of its own, but arrived at a similar result: "We believe that the appropriate test for searches by high school officials is two-pronged. The first requirement is that the search be within the scope of the school's duties. The second requirement is that the action taken, the search, be reasonable under the facts and circumstances of the case. Although *in loco parentis* is applicable, the Fourth Amendment limits that power to acts that meet [the] above requirements. In this case, prevention of the use of marijuana is clearly within the duties of school personnel and the action taken, the verification of the report, was reasonable." (*Id.,* at p. 782.) We understand this passage to suggest that the doctrine of *in loco parentis* provides a power to search which is limited only by much reduced Fourth Amendment protections; for "scope" and "reasonableness" are broadly defined in the court's opinion: "Although the Constitution prevents searches at the whim of the officials, searches are permitted whenever they reasonably fall within the scope of the school's duties and responsibilities. The test for cause is whether or not there was enough information to start a police investigation." (*Ibid.*; see also *People* v. *Jackson* (1971) 65 Misc.2d 909 [319 N.Y.S.2d 731], affd. (1972) 30 N.Y.2d 734 [333 N.Y.S.2d 167, 284 N.E.2d 153].)

*Christopher W.*'s dilution of Fourth Amendment protections on high school campuses by use of the *in loco parentis* doctrine and a much relaxed

standard of probable cause must be reexamined. Both concepts are suspect today for several reasons. First, and most obvious, it would be difficult to argue that *in loco parentis* could be utilized to justify the search of an adult on a high school campus; but many high school students have reached the age of majority or are emancipated, and may lawfully reject parental authority. That was not often true when *Christopher W.* was written. The age of majority was 21 at the time the opinion appeared in January 1973, and legislation lowering the age to 18 was not effective until January 1, 1974 (Civ. Code, § 25.1). No reported case since has considered whether disparate application of fundamental constitutional protections to similarly situated high school students in the same classroom, based only on the fortuity of a birth date, might violate principles of equal protection.

Turning several cases which stand for the expansion of the constitutional rights of children upside down and relying on *Christopher W., Thomas G.,* and *Donaldson,* all of which involved minors, not adults, an Attorney General's opinion attempts to dodge the equal protection dilemma by bluntly suggesting that adult students on high school campuses are simply subject to the same reduction of constitutional protection as their juvenile classmates: " 'Constitutional rights do not mature and come into being magically only when one attains the state defined age of majority.' (*Planned Parenthood of [Central] Missouri* v. *Danforth* (1976) 428 U.S. 52, 74-75.)" (62 Ops.Cal.Atty.Gen. 344, 349 (1979).) But this position is not easily defended. Are school grounds an archipelago across the map of America where the Fourth Amendment hardly applies? Or are adult students to be treated differently for Fourth Amendment purposes than, say, faculty members and other adults, such as parents who might visit the campus? And what of the equal protection problem *that* would raise?

The second major difficulty with the *in loco parentis* concept is simply that it does not hold up well under close analysis in the high school setting. Many have noted its counterproductive aspects: "It is idle to talk about civil liberties to adults who were systematically taught in adolescence that they had none; and it is sheer hypocrisy to call such people freedom-loving." (Friedenberg (1965) *The Dignity of Youth and Other Atavisms,* at p. 93, as quoted in Buss, *supra,* 59 Iowa L.Rev. at p. 792.)

Also, the doctrine is commonly misunderstood—and abused: "Insofar as *in loco parentis* sums up the peculiar school-student relationship and the school's related interest in searching students, it focuses almost entirely on protection of the other students and on coercive power over the searched student. One of the things that makes *in loco parentis* such an erroneous phrase in this context is precisely the absence of a genuinely parental protective concern for the student who is threatened with the school's power.

. . . What so many of the courts persist in talking about as a parental relationship between school and student is really a law enforcement relationship in which the general student society is protected from the harms of antisocial conduct. As such, it should be subjected to law enforcement rules." (Buss, *supra*, 59 Iowa L.Rev. at p. 768, fn. omitted.)

Another critic, noting that *in loco parentis* is defended on the claimed necessity of protecting presumably incompetent children, argues it should be severely limited: "If a factual case can be made that students' incompetence to exercise certain constitutional rights creates intolerable risks to themselves or to others, restriction may be warranted. The presumptive starting point, however, should be rejection of any such claim. The burden should lie where it generally does when constitutional rights are at stake; on the party seeking to curtail those rights. Experience suggests that often the state can present nothing more to overcome such a presumption than the bare assertion that curtailment is necessary." (Letwin, *Perspectives on the Post-Civil War Amendments, After* Goss v. Lopez: *Student Status as Suspect Classification?* (1977) 29 Stan. L.Rev. 627, 643, fn. omitted.) Professor Letwin's argument finds support in United States Supreme Court cases involving the scope of the First Amendment on high school campuses (*Tinker v. Des Moines School Dist.* (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733]) and due process requirements in school suspensions (*Goss v. Lopez* (1975) 419 U.S. 565 [42 L.Ed.2d 725, 95 S.Ct. 729]).

Finally, as we noted above, the concept of *in loco parentis* obviously depends on parental prerogatives: If they are removed, so must the powers allegedly derived from them. As one court stated in flatly holding the right to be free from illegal searches and seizures inapplicable to schools, "The same procedure employed by the principal, if used by the boy's father, would not violate security of appellant under the Fourth Amendment." (*Mercer v. State* (Tex.Civ.App. 1970) 450 S.W.2d 715, 717; but see *Tarter v. Raybuck* (6th Cir. 1984) 742 F.2d 977, 981, fn. 4, calling this reasoning "unsound.") However, in California the right of parents to authorize police searches of their children's belongings has been considerably weakened.

It may not be an exaggeration to suggest *in loco parentis* as a source of authority for searches of high school students in California was dealt a fatal blow by *In re Scott K.* (1979) 24 Cal.3d 395 [155 Cal.Rptr. 671, 595 P.2d 105]. There, our Supreme Court decided a father's consent could not justify a warrantless police search of a locked toolbox in his minor son's bedroom. (Cf., *Vandenberg v. Superior Court* (1970) 8 Cal.App.3d 1048 [87 Cal.Rptr. 876].) Extrapolating the *Scott K.* decision to the facts of *Christopher W.*, it seems clear the warrantless locker search could not have been

authorized by Christopher W.'s own father, much less accomplished by a high school official with only the implied consent of the parents.[2]

*Scott K.* is of additional interest to our inquiry beyond its novel holding. Although arriving at a wholly different conclusion, the court begins by appearing to embrace the reduced level of Fourth Amendment protection previously afforded high school students by the Court of Appeal decisions for juveniles in general: "By no means are the rights of juveniles coextensive with those of adults. (See *In re Roger S.* (1977) 19 Cal.3d 921, 928 [141 Cal.Rptr. 298, 569 P.2d 1286].) Minors' rights are often legitimately curtailed when the restriction serves a state's interest in promoting the health and growth of children. (See *Prince* v. *Massachusetts* (1944) 321 U.S. 158, 168-170 [88 L.Ed. 645, 653-655, 64 S.Ct. 438]; *Ginsberg* v. *New York* [*supra*] 390 U.S. 629, 638 [20 L.Ed.2d 195, 203, 88 S.Ct. 1274].) In juvenile court proceedings rights may not be asserted if they might disrupt unique features of the proceedings; for example, jury trial is not required. [Citation.]"[3] (*Id.,* 24 Cal.3d at pp. 401-402.)

Having said this, the court next considered whether the Fourth Amendment had any application to juveniles at all and, as we have already revealed, rather resoundingly concluded it did: "Justice should not be compromised by well-intentioned aims to correct transgressing youths, and the rehabilitative value of treating juveniles with fairness must not be underrated. [Citations.] Among sister states the extension of Fourth Amendment protections to minors is widespread. California Courts of Appeal have correctly, we believe, assumed that juveniles do enjoy the rights pronounced in *People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513], and thus have focused their inquiries on whether the search in question was reasonable. Only recently we endorsed that assumption sub silentio. (*In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957].)" (*Id.,* 24 Cal.3d at p. 402, fns. omitted.)

Despite the generous application of the Fourth Amendment to juveniles in the area of parental consent, *Scott K.* can be read to imply a considerable reduction of its protection in other contexts. In a footnote appended to the quoted text, four cases are cited without explanation, apparently to illustrate the "focus" of the Courts of Appeal: Two are the *Donaldson* and *Christopher W.* school locker search decisions discussed above; but the others, *In re Joseph A.* (1973) 30 Cal.App.3d 880 [106 Cal.Rptr. 729] (disapproved

---

[2] A dissenting opinion in *Scott K.* alludes to this point: "If the *loco parentis* status of a school official permits a search of a locked container in order to protect against and prevent violations of the criminal laws, a fortiori, a parent has an equal right." (*In re Scott K., supra,* 24 Cal.3d at p. 407, dis. opn. of Clark, J.)

[3] None of the cited cases deals with a Fourth Amendment issue.

on another point in *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142]) and *In re Robert H.* (1978) 78 Cal.App.3d 894 [144 Cal.Rptr. 565], are police search cases (*In re Scott K., supra,* 24 Cal.3d at p. 402, fn. 6).

Were the school locker decisions cited only for the narrow point that the Fourth Amendment has some application to searches of children's belongings, or did the court also mean to endorse the idea of warrantless searches in high schools on mere suspicion? And by lumping the school decisions together with police search cases, did it intend to infer that a reduced standard of probable cause could also be applied to police searches of juveniles in general? *Scott K.*'s reliance on *In re Tony C., supra,* 21 Cal.3d 888 dictates a negative answer to the second question. As to the first, probable cause was not truly at issue in either *Donaldson* or *Christopher W.,* and the failure to obtain a warrant could have been defended in both on the familiar exigent circumstances exception. (See, e.g., *People* v. *Lanthier* (1971) 5 Cal.3d 751 [97 Cal.Rptr. 297, 488 P.2d 625].) Moreover, *Scott K.*'s expansion of Fourth Amendment protection of children hardly suggests that the reference to the school locker search cases ought to be taken to imply high schools may operate as authoritarian enclaves exempt, in the main, from the strictures of the Fourth Amendment.

Nor does the theory of an enervated Fourth Amendment on high school campuses appeal to us; in a system of compulsory education, the state has a difficult position to defend when it seeks to deny its captive charges the fundamental human rights enjoyed elsewhere by adults and children—to say nothing of the difficult equal protection concerns we noted earlier.[4] As the United States Supreme Court said more than 40 years ago, "That [schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." (*Board of Education* v. *Barnette* (1943) 319 U.S. 624, 637 [87 L.Ed. 1628, 1637, 63 S.Ct. 1178, 147 A.L.R. 674].) More recently, in considering the question of whether the due process clause mandates a hearing for suspended students, the court added, "Although Ohio may not be constitutionally obligated to establish and maintain a public school system, it has nevertheless done so and has required its children to attend. Those young people do not 'shed their con-

---

[4]We should have a modern definition of the role of the exclusionary rule, if any, in prosecutions based on campus searches soon. The question is currently before both the California Supreme Court (*In re William G.,* Crim. 22945, hg. granted Jan. 19, 1983) and the United States Supreme Court (*State in the Interest of T.L.O.* (1983) 94 N.J. 331 [463 A.2d 934, 940]. cert. granted, *sub nom., New Jersey* v. *T.L.O.* 464 U.S. 991 [78 L.Ed.2d 678, 104 S.Ct. 480]).

stitutional rights' at the schoolhouse door. [Citation.]" (*Goss* v. *Lopez, supra,* 419 U.S. 565, 574 [42 L.Ed.2d 725, 734, 95 S.Ct. 729].)

We believe *Donaldson, Thomas L., Fred C.,* and *Christopher W.* are legally obsolete. We must concur instead with later authority from other jurisdictions which has given full effect to the Fourth Amendment in criminal and juvenile proceedings where evidence obtained in a school search is offered against the accused. In *State* v. *Mora* (La. 1975) 307 So.2d 317 (judgment vacated and cause remanded (1975) 423 U.S. 809 [46 L.Ed.2d 29, 96 S.Ct. 20], opinion on remand (La. 1976) 330 So.2d 900, cert. den. 429 U.S. 1004 [50 L.Ed.2d 616, 97 S.Ct. 538]), for example, a student was sentenced to six months in jail for possession of marijuana discovered by his physical education instructor in a warrantless, surreptitious search of his wallet in the high school locker room. The court first rejected the private citizen theory: "Because of the function of these school officials and their strict accountability to the State, we must conclude that these school officials, insofar as they are discharging their duties by enforcing State policies and regulations, are within the purview of The Fourth Amendment's prohibition; therefore, their students must be accorded their constitutional right to be free from warrantless searches and seizures." (*Id.,* at p. 319.) It then held, "a search on school grounds of a student's personal effects by a school official who suspects the presence or possession of some unlawful substance is not a 'specifically established and well-delineated' exception to the warrant requirement and . . . the fruits of such a search may not be used by the State prosecutorial agency as the basis for criminal proceedings." (*Id.,* at p. 320; cf., *State in the Interest of T.L.O., supra,* 463 A.2d 934, 940, cert. granted, *sub nom. New Jersey* v. *T.L.O.* 464 U.S. 991 [78 L.Ed.2d 678, 104 S.Ct. 480].)

A generally unspoken theme which has been said to underlie some of the cases straining to avoid full implementation of the Fourth Amendment in the school setting is a misplaced concern for the potential civil liability of school officials. But "[t]he answer to that problem is not to apply a watered-down Fourth Amendment standard in criminal prosecutions but to recognize a qualified immunity for school officials in civil actions." (*State* v. *McKinnon* (1977) 88 Wn.2d 75, 90 [558 P.2d 781], dis. opn. of Rosellini, J.) That has already occurred: "It is well settled that school officials possess a qualified good faith immunity with respect to acts performed within the course of their duties. *Wood* v. *Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), reh. den., 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975); Note, *School and School Officials,* 78 W.Va.L.Rev. 259 (1975)." (*Bellnier* v. *Lund* (N.D.N.Y. 1977) 438 F.Supp. 47, 54.)

Thus, although our research reveals a manifest failure of courts in general to arrive at a consensus which coherently reconciles Fourth Amendment

freedoms with schoolyard exigencies in the quarter century since *Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933], we conclude that if there ever was sufficient reason to treat high school administrative searches differently from other government searches in juvenile and criminal prosecutions, it no longer exists. As one authority has aptly stated, "Peaceful or not, the educational prospects of schools run on the model of an authoritarian regime are dubious. Such schools are less educational institutions than institutions for custodial confinement whose principal assignment is to keep the young off the streets, out of trouble and off the labor market. The resulting atmosphere is likely to prove incompatible with either learning or teaching." (Letwin, *supra,* 29 Stan.L.Rev. at p. 650, fns. omitted.)

At least one court has tracked our reasoning to this point and then determined suppression is not available in the prosecution of students when evidence has been illegally obtained but without police involvement (*State* v. *Young* (1975) 234 Ga. 488 [216 S.E.2d 586]). There it was held, "the mere fact that action is taken by state officials is not adequate to invoke the exclusionary rule even if that action violates the Fourth Amendment. As we noted above, the exclusionary rule does not reach so far as does the Fourth Amendment and the rule has not been applied save to action taken by law enforcement personnel. The tide is turning, we think properly, away from the exclusionary rule; and we decline to extend it to apply to searches by non-law enforcement persons."[5] (*Id.,* at p. 494.)

The dissent in *Young* correctly notes the failure of the majority to distinguish *Camara* v. *Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727] and *See* v. *City of Seattle* (1967) 387 U.S. 541 [18 L.Ed.2d 943, 87 S.Ct. 1737]; in both cases the Supreme Court held the Fourth Amendment applicable to attack evidence acquired in administrative searches and offered in criminal prosecutions. (*State* v. *Young, supra,* at p. 500, dis. opn. of Gunter, J.) Since *Young* was decided, evidence obtained in illegal administrative searches and offered in criminal prosecutions has been ordered suppressed in two other Supreme Court cases (*Michigan* v. *Clifford* (1984) 464 U.S. 287 [78 L.Ed.2d 477, 104 S.Ct. 641] and *Michigan* v. *Tyler* (1978) 436 U.S. 499 [56 L.Ed.2d 486, 98 S.Ct. 1942]).

Similarly, at least where adults are involved, California has not hesitated to apply the exclusionary rule in prosecutions arising from searches by gov-

---

[5]There is much to be said for the court's forecasting of constitutional winds: "Of late, the [United States Supreme] Court has acquired a voracious appetite for judicial activism in its Fourth Amendment jurisprudence, at least when it comes to restricting the constitutional rights of the citizen." (*New Jersey* v. *T.L.O.* (1984) — U.S. —, — [82 L.Ed.2d 881, 882, 104 S.Ct. 3583] (dis. opn. of Stevens, J.).)

ernmental officials other than police officers (*Vidaurri* v. *Superior Court* (1970) 13 Cal.App.3d 550 [91 Cal.Rptr. 704]) and even private security guards under appropriate circumstances (*People* v. *Zelinski* (1979) 24 Cal.3d 357 [155 Cal.Rptr. 575, 594 P.2d 1000]; *Dyas* v. *Superior Court* (1974) 11 Cal.3d 628 [114 Cal.Rptr. 114, 522 P.2d 674]; but compare *In re Deborah C.* (1981) 30 Cal.3d 125, 134-135 [177 Cal.Rptr. 852, 635 P.2d 446] and *In re Victor F.* (1980) 112 Cal.App.3d 673, 680-681 [169 Cal.Rptr. 455]).

While we concur with the idea that the Fourth Amendment and the exclusionary rule are not coextensive, we must disagree with a line of demarcation which would treat prosecuted high school students differently from any other defendant. It is no less offensive to the Constitution to permit the introduction of unlawfully obtained evidence in a juvenile or criminal prosecution simply because the site of its improper acquisition happened to have been a high school campus. Arguably, it is more so. We would hold that the exclusionary rule is fully available in criminal prosecutions and juvenile proceedings with respect to evidence illegally obtained by high school officials, i.e., evidence obtained in searches without a warrant or some substitute for a warrant, such as a true consent or probable cause coupled with exigent circumstances.

## IV

It does not automatically follow that tainted evidence is inadmissible in a school disciplinary proceeding, however; and that *is* the appropriate point, we believe, to locate the boundary between the Fourth Amendment and the exclusionary rule. The exclusionary rule is rarely applied in civil actions in the absence of statutory authorization,[6] although government agencies may be involved, and even though the government itself has unlawfully seized the evidence. (See, e.g., *Immigration and Naturalization Service* v. *Lopez-*

---

[6]Although the Legislature has specifically provided for suppression in college and university administrative proceedings, it has not chosen to do so on the high school level. Penal Code section 626.11, subdivision (a) provides, "Any evidence seized by a teacher, official, employee, or governing board member of any university, state university, or community college, or by any person acting under his or her direction or with his or her consent in violation of standards relating to rights under the Fourth Amendment to the United States Constitution or under Section 13 of Article I of the State Constitution to be free from unreasonable searches and seizures, or in violation of state or federal constitutional rights to privacy, or any of them, is inadmissible in administrative disciplinary proceedings." (See also Pen. Code, § 632, subd. (d).)

There are sound reasons for treating college students differently: If the *in loco parentis* doctrine has any remaining vitality in the secondary schools, it surely ends there. And a college campus is the last place to apply reduced constitutional protections. Also, college students frequently reside in campus housing, where their privacy interests are considerably more vulnerable to institutional action.

*Mendoza* (1984) — U.S. — [82 L.Ed.2d 778, 104 S.Ct. 3479]; *United States* v. *Janis* (1976) 428 U.S. 433, 447 [49 L.Ed.2d 1046, 1056-1057, 96 S.Ct. 3021]; and *Governing Board* v. *Metcalf* (1974) 36 Cal.App.3d 546, 549 [111 Cal.Rptr. 724].) This is also generally true in disciplinary proceedings prosecuted on seized evidence. (*Emslie* v. *State Bar* (1974) 11 Cal.3d 210 [113 Cal.Rptr. 175, 520 P.2d 991]; *Pating* v. *Board of Medical Quality Assurance* (1982) 130 Cal.App.3d 608 [182 Cal.Rptr. 20].)

*Emslie* noted certain exceptions, however: "We sanctioned the use of the exclusionary rules in a *civil* proceeding for forfeiture of a car used in unlawful transportation of marijuana in *People* v. *One 1960 Cadillac Coupe* (1964) 62 Cal.2d 92 [41 Cal.Rptr. 290, 396 P.2d 706]. We there held 'Whatever the label which may be attached to the proceeding, it is apparent that the *purpose of the forfeiture is deterrent in nature and that there is a close identity to the aims and objectives of criminal law enforcement.* On policy the same exclusionary rules should apply to improper state conduct whether the proceeding contemplates the deprivation of one's liberty or property' . . . ." (*Id.,* 11 Cal.3d at p. 227.)

If deterrence and identity with the objectives of criminal law were sufficient of themselves to invoke the exclusionary rule, this case might fall on the *One 1960 Cadillac* side of the line. But *Emslie* recalled a third test: "In *People* v. *Moore* [1968] 69 Cal.2d 674, we found a close identity between a civil narcotic addict commitment proceeding and the aims and objectives of criminal law enforcement and the deterrent effect of applying the exclusionary rules, and we held that the rules were there applicable. However, we also held that 'Whether any particular rule of criminal practice should be applied . . . depends upon consideration of the relationship of the policy underlying the rule to the proceeding.' [Citation.]" (*Id.,* at p. 227.)

The court applied *Moore*'s balancing test in the case of *In re Martinez* (1970) 1 Cal.3d 641 [83 Cal.Rptr. 382, 463 P.2d 734], where it was held application of the exclusionary rule in the parole revocation setting would cause "disastrous" social consequences. (*Id.,* at pp. 650.) *Emslie* reached a similar result. In a disbarment proceeding, the court held, "consideration must be given to the social consequences of applying the exclusionary rules and to the effect thereof on the integrity of the judicial process." (*Emslie* v. *State Bar, supra,* 11 Cal.3d at p. 229; see also *Black* v. *State Bar* (1972) 7 Cal.3d 676, 687-688 [103 Cal.Rptr. 288, 499 P.2d 968].)

Although the court held "that the exclusionary rules are not part of administrative due process in State Bar disciplinary proceedings . . ." (*Emslie* v. *State Bar, supra,* 11 Cal.3d at p. 229), it did not totally foreclose the possibility of a circumstance where the exclusionary rule would be appro-

priately applied. But the case before it was clearly not the one: "Our independent review of the record herein indicates that Emslie committed acts in the nature of burglary and grand theft, that the commission of these acts constitutes moral turpitude and dishonesty on his part, and that the protection of the courts and the integrity of the legal profession requires that he should be disbarred." (*Id.,* at p. 230.)

Despite our criticism of many of the holdings in the juvenile and criminal prosecution cases, we do not discount their sincere—and accurate—emphasis on the duty of the school administration to protect law abiding students from delinquents among them, an obligation recently emphasized by the electorate (Cal. Const., art. I, § 28, subd. (c) ["Right to Safe Schools," passed as part of Prop. 8, an initiative measure, on June 8, 1982]). ▮ Consequently, after balancing the competing interests involved, we hold the exclusionary rule inapplicable in high school disciplinary proceedings—even where, as here, they are concededly directed in part toward punishment of the offending student. The social cost in terms of harm to other students, to say nothing of the damage to the morale of parents and teachers, is too dear.

Nor do we find this an appropriate case for application of the rare exception noted in *Emslie,* where the "demands of due process could not countenance use of [the] evidence . . . ." (*Id.,* 11 Cal.3d at p. 230.) The vice-principal's conduct was not up to probable cause standards in our view, but neither was it required to be under existing precedent. The *Donaldson-Christopher W.* line of cases has never been questioned by a California court—only by legal scholars and jurists from other jurisdictions.

Finally, we have reviewed two federal district court decisions urged by Gordon's counsel in which the exclusionary rule *was* applied to overturn discipline imposed by school boards upon students. They are distinguishable, however. We have also considered Professor Buss' argument in support of the same notion but, on this point, remain unpersuaded.

In *Jones* v. *Latexo Independent School Dist.* (E.D.Tex. 1980) 499 F.Supp. 223, three high school students succeeded in overturning drug suspensions where the whole student body was subjected to a surprise classroom visit by a dog trained to smell marijuana. The dog was walked up and down the aisles sniffing each pupil. Although the students had been warned that surprise searches were planned, the court did not find the facts analogous to the airport cases relied on by the school board (cf., *United States* v. *Edwards* (2d Cir. 1974) 498 F.2d 496), because in the canine search "the students . . . had no means of avoiding the pending searches, after they were announced, had they wished to do so." (*Jones* v. *Latexo Independent*

*School Dist., supra,* 499 F.Supp. at p. 234; but see *Doe* v. *Renfrow* (7th Cir. 1980) 631 F.2d 91.)

After stating that "standards for a search in the public school context are considerably more lax than they are in the community at large" and after acknowledging the *in loco parentis* doctrine, concepts we have labelled obsolete, the court states, "State-operated schools may not operate as enclaves of totalitarianism where students are searched at the caprice of school officials." (*Id.,* at p. 236.) In considering the question of whether the exclusionary rule should apply in the case of an undifferentiated, warrantless, search of all the students, the court elected to follow precedent similar to *People* v. *One 1960 Cadillac Coupe.* (*One 1958 Plymouth Sedan* v. *Pennsylvania* (1965) 380 U.S. 693 [14 L.Ed.2d 170, 85 S.Ct. 1246].) We review a very different set of facts today, however; there was no mass search of the student body here and no other compelling reason to apply the exception promised in *Emslie. Jones* does not assist Gordon J.

*Caldwell* v. *Cannady* (N.D.Tex. 1972) 340 F.Supp. 835 is also inapposite. There, the court held evidence illegally obtained by police officers in several off-campus searches unrelated to the school or the student status of those searched was not properly used as a basis to suspend them from school. We doubt the case would be similarly decided today in light of more recent federal authority, at least on a Fourth Amendment ground. (*Immigration and Naturalization Service* v. *Lopez-Mendoza, supra,* — U.S. — [82 L.Ed.2d 778, 104 S.Ct. 3479]; *United States* v. *Janis, supra,* 428 U.S. 433.) It is also contrary to the trend of subsequent California cases discussed above, which have generally rejected the use of the exclusionary rule in administrative proceedings. (*Emslie* v. *State Bar, supra,* 11 Cal.3d 210; *Pating* v. *Board of Medical Quality Assurance, supra,* 130 Cal.App.3d 608.)

Finally, Professor Buss advocates use of the exclusionary rule in the school disciplinary setting for several reasons which cannot be lightly cast aside. For example, minor drug and theft offenses on campus are likely to be treated more harshly by school authorities than by prosecutors and courts; and searches may be undertaken for offenses against the school that are not criminal at all, "anything from plagiarism to dissemination of forbidden 'underground' newspapers . . . ." (Buss, *supra,* 59 Iowa L.Rev. at p. 756.) He would tie the remedy to the penalty, so that the exclusionary rule would be available where the punishment, civil or criminal, was likely to be severe.

We answer, however, that the relative harshness of administrative sanctions compared to criminal penalties for the same conduct is common. The

criminal sanction available for a regulatory violation may only be a small fine for an infraction or misdemeanor, while the corresponding administrative penalty might be the loss of a lucrative liquor license or the right to practice a profession such as law or medicine. The explanation for the difference is obvious. ■ Criminal penalties are primarily designed to punish the offender. Administrative penalties may also be punitive, but they are primarily designed to protect the public from the practices of the offender. This distinction also justifies the general rule that the remedy of exclusion is not available in administrative proceedings. (See, e.g., *Emslie* v. *State Bar, supra,* 11 Cal.3d 210 and *Pating* v. *Board of Medical Quality Assurance, supra,* 130 Cal.App.3d 608.) A high school student body is not in great need of the protection of the school administration in the case of the petty plagiarist or the tyro publisher, but the courts can rein in an overexuberant school administration simply enough by dealing with the penalty imposed, rather than the procedure used to gather the evidence. Gordon does not attack the severity of the administrative sanction imposed in this proceeding.

Judgment affirmed.

Trotter, P. J., and Wallin, J., concurred.