[No. G002451. Fourth Dist., Div. Three. Sept. 30, 1986.]

MILLS LAND AND WATER COMPANY, Plaintiff and Appellant, v.
GOLDEN WEST REFINING COMPANY et al.,
Defendants and Appellants;
GULF OIL CORPORATION, Defendant and Respondent.

118

## COUNSEL

Browne & Woods, Allan Browne, Marcy Byrnes and Allen B. Grodsky for Plaintiff and Appellant.

Donald C. Smaltz, Leighton M. Anderson, Smaltz & Neelley and Hahn, Cazier & Smaltz for Defendants and Appellants.

Latham & Watkins, Karen R. Leviton and Nancy G. Scheurwater for Defendant and Respondent.

## OPINION

**SONENSHINE, J.**—This appeal concerns several measures taken by the trial court as a result of its determination an attorney in this litigation violated rule 7-103 of the California Rules of Professional Conduct (rule 7-103). The rule provides: "A member of the State Bar shall not communicate directly or indirectly with a party whom he knows to be represented by counsel upon a subject of controversy, without the express consent of such counsel. This rule shall not apply to communications with a public officer, board, committee or body."

Here, the party affected is a corporation. Opposing counsel directly contacted the corporation's former president, also an attorney, who remained a member of the board of directors and a shareholder.

The trial court disqualified the offending attorney and his law firm. In addition, the attorneys for the litigants opposing the aforementioned cor-

poration were "prohibited from discussing, disclosing or otherwise divulging any information or documents obtained by virtue of the communication. . . ." However, the court declined to disqualify counsel representing other adverse parties in the lawsuit. The court also declined to suppress all discovery to ensure no privileged or confidential information would be used in the lawsuit. In addition, the court refused to impose sanctions against the offending attorney for opposing the motion to disqualify him. Both sides appeal.

We affirm that portion of the trial court's order disqualifying the individual attorney from further participation in the lawsuit and forbidding him from discussing his communication with the corporation's former president and current director. However, in keeping with the only California precedent relied upon by the trial court (*Chronometrics, Inc.* v. *Sysgen, Inc.* (1980) 110 Cal.App.3d 597 [168 Cal.Rptr. 196]), we reverse the order insofar as it disqualifies the offending attorney's law firm. In addition, we clarify the reach of the trial court's suppression order. This resolution makes it unnecessary to reach the remaining issues raised by the parties on appeal.

I

The underlying lawsuit is an unlawful detainer action initiated by Mills Land and Water Company concerning land it owns in Huntington Beach. In 1956 Mills leased the property to Wilshire Oil Company to operate a petroleum storage depot. The lease was for 25 years with an option for another 25 years. One of the lease's terms provided Mills would not unreasonably withhold consent to an assignment of the lease.

Wilshire was succeeded by Gulf Oil Corporation. In April 1982, Gulf told Mills of its intention to assign the lease. One year later, Gulf formally asked for consent to an assignment to Thrifty Oil Company and its subsidiary Golden West Refining Company.

Ultimately, Mills consented to the assignment. But the manner in which this allegedly came about, and Mills' apparent attempt to repudiate the consent as part of its unlawful detainer action, are of substantial importance in the underlying lawsuit and this appeal.

Reputedly,[1] one director, Eugenia R. Moore, an attorney, wanted consideration from Gulf in exchange for consent to assign the lease. But the

---

[1]Of course, these matters have yet to be adjudicated in the underlying unlawful detainer action, which is in abeyance pending the outcome of this appeal.

other two directors, Carol G. Wynn[2] and Carl W. Barrow, also attorneys, apparently disagreed with Moore. They felt the only legitimate reason for withholding consent would be the assignee's inability to meet the financial obligations of the lease. After receiving financial information, Wynn and Barrow concluded Golden West, a new subsidiary of Thrifty, would be able to meet the terms of the lease. Consequently, Wynn, then president of Mills, delivered consent on July 28, 1983. It is also of note the monetary compensation provided in the lease is very unfavorable to Mills.

Subsequently, Mills went through a shake-up in management. On October 1, 1983, 51.1 percent of the shareholders discharged all the directors. Again, according to the pleadings and discovery in the underlying case, an impasse developed. The Moore family, led by Eugenia Moore and her son Robert London Moore, Jr., also an attorney, could elect one director and the Wynn family could elect another. But a third director could not be elected without shareholder Kathleen Murphy's cooperation.

Murphy was the subject of guardianship proceedings in Nevada. The Moore faction and Murphy's temporary guardian, Michael Murphy, apparently sought the court's permission in Carson City, Nevada, to allow the temporary guardian to vote Kathleen Murphy's shares.

In the Nevada proceedings both Moores declared Wynn had violated his fiduciary and legal obligations to Mills when he consented to the lease assignment. It was also alleged Wynn and Barrow met secretly with Gulf representatives and failed to follow the law with respect to director's meetings. Finally, the Moores contended the consent to the lease assignment was adverse to Mills' financial interest.

On November 7, 1983, the Carson City court granted the petition, permitting Kathleen Murphy's temporary guardian to vote on her behalf. The court did not reach the substance of the claims of mismanagement. Rather, it simply found the order was necessary to break the impasse in Mills' management.

A special meeting of Mills' shareholders was scheduled for November 21, 1983. Wynn sent a letter to the shareholders explaining the lease assignment and expressing his opinion he and Barrow had exercised their best judgment concerning Mills' legal obligations in the lease assignment matter. Nevertheless, a new board was elected: Robert Moore, Thomas E. Murphy and Wynn (whose family held sufficient shares to reelect him). Wynn was

---

[2]Contact with Wynn spawned the disqualification and this appeal.

removed as president of Mills. Robert Moore became president and Eugenia Moore corporate secretary.

Shortly thereafter, the board sought the opinion of counsel concerning the consent to the lease assignment by Mills' "former president." In October 1984, Mills filed the underlying unlawful detainer action against Gulf. In substance, Mills contends Gulf breached the lease agreement when it assigned the lease to Thrifty and Golden West.

Wynn continued to attend formal meetings of the board. However, the record suggests hostility towards Wynn by the current Mills controlling faction. He was apparently never directly informed Mills had served a three-day "Notice to Quit" on Gulf or commenced the unlawful detainer action. But he was present at a board of directors meeting where retention of a law firm in contemplation of litigation was authorized. When deposed, Eugenia Moore testified Wynn improperly executed the consent without her signature as corporate secretary and discussed the matter with Barrow without formal notice to her. Robert Moore, during his deposition, similarly condemned Wynn's actions.

Further, at Wynn's deposition, Mills' counsel sat *across* the table from Wynn, while at the Moore's depositions, Mills' counsel sat next to them. Wynn did not have a lawyer at the deposition. Mills' counsel called examination of Wynn "cross-examination." The examination itself was frequently antagonistic.

Before he was disqualified, Donald C. Smaltz was counsel for Thrifty and Golden West. Smaltz first met with the Moores and Mills' counsel in October to discuss the impending lawsuit, which was actually filed on October 19, 1984. According to Smaltz, the meeting confirmed his impression Wynn had been ousted from the presidency and there had been a corporate shake-up.

Smaltz issued deposition subpoenas on October 23, 1984, including one to Wynn. Smaltz found a listing for Wynn in the "Parker Directory of California Attorneys" and telephoned him the same day. Smaltz said he was litigation counsel for Thrifty and Golden West and was seeking a convenient deposition date. Wynn said he was not aware of the suit or the notice to quit. Smaltz asked Wynn if he was still a Mills officer and Wynn assured him he was a shareholder but not an officer. Wynn told Smaltz the Moores were running Mills; he was not represented by Mills' law firm and no one from the law firm had spoken to him. Smaltz asked Wynn if there

was any reason the two should not or could not speak directly. Wynn replied, "There is no reason."

They met the following day in Wynn's law office. Wynn explained his view of the lease assignment and the fact he signed the consent after: (1) he received information about Thrifty and Golden West's financial condition; (2) Gulf threatened to litigate; (3) Wynn discussed the matter with Barrow; and (4) Eugenia Moore declined to consent without a rent increase.

Wynn also said the Moores were responsible for Wynn's ouster; he was ousted as president after the Moores obtained the proxies of other shareholders. Wynn discussed his relationship with various people, including Robert London Moore, Sr., and Barrow. He revealed there were minutes and transcripts of shareholder meetings and named the shareholders. Wynn identified an accounting firm's report analyzing Thrifty and Golden West's net worth. Wynn revealed a law firm (not otherwise involved in the case) was retained to review his actions after he was no longer president. However, Wynn apparently did not describe any communications with these attorneys to Smaltz. Further, Smaltz maintains he neither requested nor received any corporate documents nor any confidential communications between Wynn and Mills' counsel. And, Smaltz and Wynn apparently agreed Wynn had no control over the litigation or management of Mills.

But Smaltz learned of the Nevada guardianship proceedings and, as a result, obtained the affidavits of the Moores from that proceeding. Arguably, these affidavits contradict deposition testimony in the current lawsuit concerning whether the Moores wished to extract a higher rent from Gulf in exchange for a consent to the assignment of the lease.

Through October and early November 1984, discovery proceeded on the underlying lawsuit. On November 15, 1984, Wynn's deposition was taken. Mills' counsel began by asking him if he had spoken with Smaltz. Wynn said Smaltz had called him and they met and discussed the circumstances of the lease assignment. He also said he had discussed his conversations with Barrow and Eugenia Moore on the same subject. Wynn said he had not been concerned about speaking with Smaltz because all his actions were a matter of record.

Mills' counsel completed Wynn's deposition. However, on November 16, 1984, Mills refused to proceed with discovery due to the conversation between Smaltz and Wynn. On November 20, Mills served Smaltz with a deposition subpoena.

On November 21, Thrifty and Golden West made an ex parte application for an order to enforce two prior discovery orders and quash Smaltz's subpoena. In response, Mills contended it would be bringing a motion to disqualify Smaltz. The court took all matters off calendar pending Mills' motion and permitted Smaltz's deposition to go forward.

The deposition occurred on November 28. Smaltz, asserting it was work product, objected to the production of memoranda concerning his discussion with Wynn. However, Smaltz did relate the substance of the conversation. In Smaltz's opinion, the most significant disclosure was the Nevada guardianship proceeding. He learned the litigation case number, contacted an attorney in Carson City, and obtained copies of file documents in the public record.

On December 20, Mills, relying on rule 7-103, filed its motion to disqualify Smaltz. Thrifty and Golden West opposed the motion, arguing (1) the Smaltz-Wynn conversation did not constitute communication with a corporate entity; and (2) a conflict between Wynn and Mills' counsel precluded any representation of Wynn by Mills' counsel. Mills virtually conceded its interests might be adverse to Wynn in the litigation, but nonetheless asserted its counsel represented Wynn at least in the limited capacity of protecting the corporation from Wynn divulging any adverse information.

The court below held any conflict between Wynn and Mills had no bearing on the application of rule 7-103. It ruled Wynn was a constituent of the corporation.[3] Consequently, the court disqualified Smaltz and his law firm, finding Wynn's relationship with Mills was one which required, before any interview, the consent of Mills' counsel. The court further found the violation would have a continuing effect on the lawsuit. In the court's view, Smaltz's deposition testimony was vague and inconsistent and noted Smaltz had declined to produce his notes of the interview. Consequently, "[t]he court resolve[d] any doubt as to the extent and effect of the communication on this litigation in favor of [Mills]." Disclosure of any information or documents obtained from Wynn was prohibited. Any dispute on this point would be resolved by in camera hearings.

As mentioned, both sides have appealed. Thrifty and Golden West contend: (1) Smaltz did not violate rule 7-103, and (2) even assuming he did, he and his law firm should not have been disqualified nor any information suppressed. Mills also appeals, arguing: (1) five attorneys employed by

---

[3] "Constituent" is a term employed in the American Bar Association Model Rules of Professional Conduct, rule 1.13, including all corporate officers, directors, employees and agents.

Gulf's counsel (Latham & Watkins) should *also* have been disqualified because Smaltz contacted them, (2) *all* discovery should have been suppressed, and (3) Mills was entitled to monetary sanctions.

## II

"Trial courts in civil cases have the power to order disqualification of counsel when necessary for the furtherance of justice. [Citations.] *Exercise of that power requires a cautious balancing of competing interests.* The court must weigh the combined effect of a party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that the fair resolution of disputes within our adversary system requires vigorous representation of parties by independent counsel . . . . [Citations.]" (*William H. Raley Co.* v. *Superior Court* (1983) 149 Cal.App.3d 1042, 1048 [197 Cal.Rptr. 232], italics added.) Determination of the motion lies within the trial court's discretion (*ibid.*), but judicial discretion is a legal discretion subject to the limitations of the legal principles governing the subject of its action, and subject to reversal on appeal where no reasonable basis for the action is shown. (*Westside Community for Independent Living, Inc.* v. *Obledo* (1983) 33 Cal.3d 348, 355 [188 Cal.Rptr. 873, 657 P.2d 365].)

First, we conclude Smaltz's contact with Wynn was improper. At least it was wrong, as we shall discuss, without first obtaining a court order so any contact, if permitted, could accommodate Wynn's dual role as a pivotal witness and an ongoing director. Thus, relying largely on *Chronometrics, Inc.* v. *Sysgen, Inc., supra,* 110 Cal.App.3d 597, we affirm that portion of the order disqualifying *Smaltz.* However, we also *limit* the relief to that given in *Chronometrics.* Hence, we conclude it was an abuse of discretion to disqualify Smaltz's law firm. (See *id.,* at p. 608; see also *William H. Raley Co.* v. *Superior Court, supra,* 149 Cal.App.3d 1042, 1049; *Chambers* v. *Superior Court* (1981) 121 Cal.App.3d 893 [175 Cal.Rptr. 575].) Moreover, we clarify and limit the scope of the trial court's suppression order: it is proper insofar as it prohibits Smaltz from discussing the interview; it cannot properly be read to require the suppression of nonprivileged information merely because it might have been initially discovered during this interview. (See *Chronometrics Inc.* v. *Sysgen, Inc., supra,* at pp. 607-608; cf. also *Standard Oil Company* v. *State of Iowa* (8th Cir. 1969) 408 F.2d 1171, 1176.)

At the same time, we do not wish to minimize the difficulty of the task which the trial court faced in resolving this matter. We cannot help but echo

a comment from *Raley*: "We wish to emphasize the *sui generis* nature of this case. It is a square peg which does not fit into the round holes of the rules most commonly applied in attorney disqualification cases. [Citation.]" (*William H. Raley Co.* v. *Superior Court, supra,* 149 Cal.App.3d 1042, 1049-1050, fn. 3.)

As noted, a cautious balancing of competing interests is required. (*William H. Raley Co.* v. *Superior Court, supra,* 149 Cal.App.3d 1042, 1048.) But here, the competing interests present a difficult, if not insoluble dilemma. In this lawsuit Wynn occupies *two* distinct and conflicting positions. On the one hand, he is the fired former president of Mills. The company is attempting to disavow and condemn actions Wynn took as its president. On the other hand, Wynn remains an *active* director of Mills. As such, he may very well be called upon to discuss and consider the underlying litigation as a constituent of Mills. This may include, among other things, consultation with Mills' counsel and consideration of Mills' strategy and settlement posture.

It appears the parties, at least below, tacitly recognized this dilemma, and they discuss these roles occupied by Wynn again on appeal. However, each side also tends to discuss only that role occupied by Wynn favorable to its position and downplays the other. Unfortunately, the court below chose to focus only on Wynn's role as a current director and resolved the issue without considering the interplay of Wynn's unique position in the litigation. Nevertheless, we resolve the matter in the manner we conclude is appropriate in light of the record rather than remanding for reconsideration by the trial court. As Mills forcefully noted below, the underlying lawsuit is an unlawful detainer action, entitled to expedited consideration. Further delay occasioned by reconsideration would benefit no one. (See *Chambers* v. *Superior Court, supra,* 121 Cal.App.3d 893, 903.)

III

First, we discuss the propriety of Smaltz's contact and interview with Wynn. We reject, as did the trial court, Thrifty and Golden West's central contention. They urge rule 7-103 must be liberally construed. That is, when a corporate constituent, such as a director, is not in the group controlling the corporation, ex parte contact does not violate the rule because the corporation cannot be bound or otherwise affected by the contact. For several reasons, the argument is untenable. And even if the point has merit where corporate counsel has a conflict of interest with the director, we

conclude no ex parte contact is permissible absent a court order permitting it.[4]

We have little trouble determining a current director is a corporate constituent forbidding as a general rule ex parte contact pursuant to rule 7-103. The Corporations Code establishes directors, in essence, guide the business of any corporation. (See Corp. Code, §§ 160, 164, 300.) Directors owe a fiduciary duty to a corporation. (*Burt* v. *Irvine Co.* (1965) 237 Cal.App.2d 828 [47 Cal.Rptr. 392].)[5] Among other things, directors control the progress of litigation. (See *A. Paladini, Inc.* v. *Superior Court* (1933) 218 Cal. 114, 121 [21 P.2d 941]; *Donohoe* v. *Mariposa L. & M. Co.* (1885) 66 Cal. 317 [5 P. 495].)

It is this aspect of Wynn's dual role, emphasized here by Mills, that Thrifty and Golden West ignore. As a current director, Wynn is entitled to attend board meetings where the litigation may be discussed, perhaps with counsel. Corporations enjoy an attorney-client privilege. (*D. I. Chadbourne, Inc.* v. *Superior Court* (1964) 60 Cal.2d 723, 732 [36 Cal.Rptr. 468, 388 P.2d 700]; Evid. Code, §§ 175, 953, subd. (d).) The question is not simply whether Wynn was in a position to bind Mills in some fashion. His position makes him *potentially* privy to *privileged* information about the litigation.[6] To establish a "flexible" rule permitting ex parte communication absent a court order would seriously undercut the ability of corporate counsel to represent their client. (See *Mitton* v. *State Bar* (1969) 71 Cal.2d 525, 534 [78 Cal.Rptr. 696, 455 P.2d 800].)

Formal Opinion No. 410 of the Los Angeles County Bar Association (Apr. 20, 1983), also employed below, is persuasive. Its conclusion—"It is not proper for opposing counsel or its investigator to contact ex parte an employee of a corporation that is a party to a suit knowing that the information sought from the employee relates to a subject of controversy."

---

[4]There is some question whether Smaltz actually knew Wynn was still a director when contact was initiated. But it is clear he learned this during their meeting and continued to speak. Moreover, Smaltz does not plead ignorance as an excuse or in mitigation.

[5]Majority stockholders with the ability to control a corporation also have a certain fiduciary duty. (See *Efron* v. *Kalmanovitz* (1964) 226 Cal.App.2d 546 [38 Cal.Rptr. 148].) Wynn was a shareholder, although not apparently with control of Mills. Given his continuing status as a director, we need not address the application of rule 7-103 to a mere shareholder, whether or not in control.

[6]Because on this record we cannot conclude privileged information *was* divulged, we here emphasize the *potential*. Nevertheless, as we shall discuss, preserving the efficacy of rule 7-103 requires an attorney cannot be given the responsibility of determining the rule's applicability.

The request upon which the opinion is predicated involved contact with employees who were "not members of the control group of the corporation." It was urged such employees should not be included within the ambit of rule 7-103. But the opinion concludes "it is best to draw a clear and unequivocal line—opposing counsel should not have ex parte contacts concerning a subject of controversy with the employees of a corporate party to the controversy."

At the time of the contact here, Wynn was a *former* employee—specifically, the former president. But he was a *current* director. Thus, the question becomes, should the "clear and unequivocal line" be drawn to include current directors? We believe the reasons behind the application of rule 7-103 to corporate employees compel application of the rule to directors as well.

 Formal Opinion No. 410 encapsules the reasons application of rule 7-103 should not depend on an *employee's* status within or without a corporation's ruling hierarchy: 1) the employee may be directly or indirectly prejudiced by the ex parte contact; (2) the corporation has an interest in keeping information and knowledge garnered by an employee in the course of employment from release to an opponent in litigation *without the protection and advice of counsel;* (3) the employee might be induced to make admissions or statements binding upon the corporation; and (4) it is difficult to ascertain who is a member of the control group. Thus, an attorney might initiate contact, only to find out later the contact was improper because the person did belong to the control group.

The same reasoning applies to a corporate director. If anything, a director embodies a corporation to an even greater extent than does a salaried employee. As previously discussed, the directors by definition control the corporation, including litigation in which it is involved. Ex parte contact has a great potential for compromising the interest of the corporation and corporate counsel's ability to direct the litigation. In particular, an employee who makes a statement in the course and scope of employment may bind the corporation. (Evid. Code, § 1222.) We see no reason a director could not do the same. Hence, the same potential problems exist.

Thrifty and Golden West dispute the point, arguing Wynn, given his position, could in no way bind Mills. First, the point is at least debatable, rendering it improper for opposing counsel to make a unilateral determination. Second, it is not simply binding admissions that are at stake. As noted, the communication compromises the effectiveness of corporate counsel. Third, opposing counsel cannot know in advance what will develop

during the interview. Thus, the unilateral decision is based on *expectations* or *predictions*. This inevitable uncertainty hardly commends the position of Thrifty and Golden West. It would essentially make the inviolability of rule 7-103 dependent upon the resourcefulness of opposing counsel in attempting to compromise it. It would be anomalous, at best, to place an *ethical* rule in such a compromising circumstance.

We also reiterate the fundamental reasons behind rule 7-103: "This rule is necessary to the preservation of the attorney-client relationship and the proper functioning of the administration of justice . . . . It shields the opposing party not only from an attorney's approaches which are intentionally improper, but, in addition, from approaches which are well intended but misguided. [¶] *The rule was designed to permit an attorney to function adequately in his [or her] proper role and to prevent the opposing attorney from impeding his [or her] performance in such role*. If a party's counsel is present when an opposing attorney communicates with a party, counsel can easily correct any element of error in the communication or correct the effect of the communication by calling attention to counteracting elements which may exist. Consequently, before any direct communication is made with the opposing party, consent of the opposing attorney is required." (*Mitton* v. *State Bar, supra,* 71 Cal.2d 525, 534, italics added [discussing former rule 12 now embodied in rule 7-103].)

Formal Opinion No. 410 finds guidance in *Upjohn Co.* v. *United States* (1981) 449 U.S. 383 [66 L.Ed.2d 584, 101 S.Ct. 677]. The Supreme Court held communications between corporate general counsel and employees were protected by the attorney-client privilege and the work product doctrine and these protections applied against an Internal Revenue Service summons. In so holding, the court rejected the "control group" distinction discussed in the ethics opinion and which, in essence, Thrifty and Golden West urge here. An attempt to draw this distinction would largely destroy the ability of corporate counsel to freely communicate, i.e., to both *receive* information and *give* advice on the subject litigation. (*Id.,* at pp. 391-393 [66 L.Ed.2d at pp. 592-594].)

The present case illustrates the point. Wynn was still involved in the corporation as a director. At least in this discreet role, corporate counsel represented Wynn. In this respect, the reasoning of the ethics opinion and *Upjohn* apply.

Further, we are compelled to reject unilateral contact in light of the California Supreme Court note concerning former rule 12 in *Abeles* v. *State Bar* (1973) 9 Cal.3d 603, 609, fn. 7 [108 Cal.Rptr. 359, 510 P.2d

719]: "Any dispute as to the authority of the counsel of record to act for the party he purports to represent may be raised in the trial court. (See, e.g., *People* v. *Mariposa Co.* [1870] 39 Cal. 683, 684-685; *Clark* v. *Willett* [1868] 35 Cal. 534, 538-540; *Wilson* v. *Barry* [1951] 102 Cal.App.2d 778, 779-780 [228 P.2d 331]; *People* v. *Honey Lake Valley Irr. Dist.* [1926] 77 Cal.App. 367, 374 [246 P. 819]; Basic Cal. Practice Handbook (Cont.Ed.Bar 1959) p. 26.) *The dispute should not be resolved unilaterally by the opposing attorney.*" (Italics added.) As *Abeles* indicates, the "rule 'is necessary to the preservation of the attorney-client relationship and the proper functioning of the administration of justice. . . . It shields the opposing party not only from an attorney's approaches which are intentionally improper, but, in addition, from approaches which are well intended but misguided.'" (*Id.,* at p. 609.) This is yet another indication an *attorney's* assessment of the propriety of contact cannot be determinative.

Thus, the position urged here should have been raised first with the trial court before communication. The authorities on which Thrifty and Golden West rely are not persuasive on this particular point. *Wright By Wright* v. *Group Health Hosp.* (1984) 103 Wn. 2d 192 [691 P.2d 564] advocates a flexible approach to application of a comparable disciplinary rule. In particular, the court was concerned with a corporation using the "party" concept to unfairly shield witnesses from the opposition. We agree with much of *Wright,* but again, our Supreme Court has made it clear it is not the attorney, but the court, who should make the determination. And, in *International Business Machines Corp.* v. *Edelstein* (2d Cir. 1975) 526 F.2d 37 [33 A.L.R.Fed. 574], the Second Circuit reversed the trial court's order precluding private interview of adverse witnesses. This case actually reinforces our conclusion because it involves review of a *judicial decision* on the issue.

We hold an attorney may not make a unilateral decision on the application of rule 7-103 involving a corporate party. Wynn, as a Mills corporate director, came within the rule. Smaltz, at a minimum, violated the letter of rule 7-103, *at least* insofar as he failed to seek leave of court to interview Wynn without the participation of Mills' corporate counsel.

## IV

In light of the foregoing, we conclude the trial court did not abuse its discretion when it disqualified Smaltz *personally* from further participation in the litigation. As noted, we rely on the reasoning of *Chronometrics, Inc.* v. *Sysgen, Inc., supra,* 110 Cal.App.3d 597-598.

*Chronometrics* is helpful. There, a cross-complainant's attorney (also president of Chronometrics) communicated without the consent of counsel with a cross-defendant on a subject of the litigation. The trial court disqualified the attorney and his law firm. The Court of Appeal affirmed the disqualification of the attorney, but reinstated his law firm.

Of course, one distinction is immediately apparent—*Chronometrics* involved contact with an *individual* party whereas here, we have contact with a *corporate* constituent. Thrifty and Golden West dispute this, as we discuss, *post*. But a more interesting distinction is the remedy fashioned in *Chronometrics*. The individual attorney was disqualified, but his firm was not and the wrongfully obtained information was *not* suppressed. (*Id.*, at pp. 607-608.)

Nevertheless, *Chronometrics* is highly instructive on this particular point: "We detect a common theme in the cases relating to disqualification of attorneys by trial courts. If the status or misconduct which is urged as a ground for disqualification will have a continuing effect on the judicial proceedings which are before the court, it is justified in refusing to permit the lawyer to participate in such proceedings. . . . If, on the other hand, the court's purpose is to punish a transgression which has no substantial continuing effect on the judicial proceedings to occur in the future, neither the court's inherent power to control its proceedings nor Code of Civil Procedure section 128 can be stretched to support the disqualification. [¶] In applying this principle to the instant case, we recognize that such information as [the disqualified attorney] may have learned from [the party] cannot be unlearned and that, whether [the disqualified attorney] is or is not disqualified as counsel, he can use this information as president of Chronometrics. Still it cannot be said that the court's order served no useful purpose in exercising proper control of the proceedings before the court. As counsel, [the disqualified attorney] would have the improperly obtained facts instantly available in his mind in questioning witnesses, making and responding to objections and addressing the court and jury. [The disqualified attorney] as counsel would be in quite a different position from a substituted counsel who might acquire such information second hand by discussions with [the disqualified attorney] before or after court sessions or during recesses. It was not an abuse of the court's discretion to refuse to permit the wrongfully obtained information to be used by [the disqualified attorney] directly in the proceedings before the court. The extension of the disqualification beyond [the disqualified attorney] personally to his law firm has, however, no purpose but a punitive one. As we have indicated, such purposes should be accomplished through established disciplinary proceedings." (*Id.*, at pp. 607-608, fn. omitted.)

With respect to Smaltz's continued participation we draw the same conclusion. The trial court was justified in finding he might possess an unfair advantage, for which he was properly disqualified. As we emphasized earlier, even if corporate counsel had a conflict vis-à-vis Wynn as an individual in this litigation, Smaltz should have obtained a court order to permit ex parte contact if the court deemed it appropriate. In short, Smaltz directly created the predicament of which he and his clients now complain. Consequently, we discern no unfairness in prohibiting his further participation in the litigation. The trial court's order was proper in this respect.

## V

However, balancing the competing interests (*William H. Raley Co.* v. *Superior Court, supra,* 149 Cal.App.3d 1042, 1048), we conclude disqualification of Smaltz's entire firm was an abuse of discretion (*Chronometrics Inc.* v. *Sysgen, Inc., supra,* 110 Cal.App.3d 597, 608; see also *Chambers* v. *Superior Court, supra,* 121 Cal.App.3d 893). "Automatic or mechanical application of the vicarious disqualification rule can be harsh and unfair to both a law firm and its client. [Citations.] The better approach is to examine the circumstances of each case in light of the competing interests noted above. [Citation.]" (*William H. Raley Co.* v. *Superior Court, supra,* at p. 1049.)

The circumstances of this case simply do not compel the disqualification of Smaltz's law firm.[7] In this respect the trial court's order says the following: "The Court resolves any doubt as to the extent and effect of the communication on this litigation in favor of plaintiff. Likewise, the extent of involvement of other members of the Smaltz & Neelley firm is unknown re knowledge of the communications as this line of inquiry was objected to at the Smaltz deposition. Any doubt as to the propriety of disqualifying the entire firm, in light of the record herein, is resolved in favor of plaintiff and the integrity of this proceeding."

We perceive several difficulties with the trial court's approach with respect to this particular aspect of its order. First, resolving all "doubts" in Mills' favor appears to reflect an indiscriminate adoption of a federal standard that is at the very least implicitly inconsistent with California precedent concerning attorney disqualification.

The trial court apparently gleaned this language from one of the two cases on which it expressly relied. The court indicated its "decision [was] com-

---

[7] Smaltz & Neelley during most of this litigation; now Hahn, Cazier & Smaltz.

pelled by the holdings in *Chronometrics Inc.* v. *Sysgen, Inc.* (1980) 110 Cal.App.3d 597 and *American Protection Insurance Company* v. *MGM Grand Hotel* [9th Cir. 1984]."

Reliance on the latter case immediately presents a difficulty. The opinion no longer exists for precedential purposes; at the request of the Ninth Circuit, the case was withdrawn from the bound volume. (See *Maruman Integrated Circuits, Inc.* v. *Consortium Co.* (1985) 166 Cal.App.3d 443, 451, fn. 7 [212 Cal.Rptr. 497]; see also Cal. Rules of Court, rule 977(a).)

A perusal of the withdrawn opinion reveals it provided a substantial portion of the foundation upon which the trial court based its conclusion. In particular, the opinion indicates only the possibility of obtaining confidential information must be shown and all doubts on this issue are to be resolved in favor of disqualification.[8] Other federal cases, still extant, announce largely the same standards. (See, e.g., *Hull* v. *Celanese Corporation* (2d Cir. 1975) 513 F.2d 568, 571.) However, others also refuse to embrace this expansive standard. (See *First Wis. Mortg. Trust* v. *First Wis. Corp.* (7th Cir. 1978) 584 F.2d 201.)

More to the point, the expansive standard upon which the trial court relied here is inconsistent with the California precedent on the point. Certainly *Chronometrics* did not employ such a standard. To the contrary, only conduct that *will* have a continuing effect, not *might* have a continuing effect, justifies disqualification. (See *Chronometrics, Inc.* v. *Sysgen, Inc., supra,* 110 Cal.App.3d 597, 607.) Disqualification must be *necessary.* (See *id.,* at p. 605.) In short, our standard is inconsistent with the approach delineated in the passage from *William H. Raley Co.* v. *Superior Court, supra,* 149 Cal.App.3d 1042, 1048.

Mills seized upon the standard described in the *American Protection Insurance Company* opinion below, and does so again on appeal. Oddly, Mills nonetheless takes two inconsistent positions on the question of prejudice. On the one hand, Mills maintains it need not show prejudice to achieve *all* the relief it requested. This would be impossible, so the argument goes, and (as a victim of Smaltz's misconduct) unfair to Mills. On the other hand, Mills argues the record permits the inference "privileged" and "confidential" information changed hands during the Smaltz-Wynn interview.

---

[8]We note in passing that case also presented a fundamentally different factual background: there an employee intimately involved in the *litigation,* not just the underlying *facts,* attempted to switch sides, for a price, and help the opponents. Several ex parte communications to this end took place. No one accuses Wynn of such mercenary and unprofessional entreaties.

The first position is simply untenable, in light of the applicable standard. It is impossible for a trial court to determine whether disqualification is *necessary* if the existence of prejudice is not explored.

Much is made of the fact Smaltz, during his deposition, asserted the attorney work product privilege concerning communications within his law firm. Mills did not dispute the propriety of Smaltz's position nor did the superior court rule upon it or consider the possibility of an in camera procedure to explore the extent and nature of any communication. Punishing the exercise of this privilege is improper. (Evid. Code, § 913.) In essence, however, that is what the trial court did by resolving all doubts in favor of disqualifying Smaltz's entire firm.

Moreover, Mills' position in this respect, apparently accepted by the trial court, is inconsistent with California motion practice. "A motion is an application made to the court for an order. [Citations.] On the hearing the movant has the burden to support his [or her] motion by proof. [Citations.]" (*People* v. *Carson* (1970) 4 Cal.App.3d 782, 785 [84 Cal.Rptr. 699].) In this particular respect, Mills' position is again inconsistent. Wynn should have been able to tell Mills' counsel whether any privileged information changed hands. Attempting to disavow the reliability of the very person Mills maintains should have been protected cannot properly relieve Mills of its burden of proof on the motion. In short, contrary to its contentions, access to proof was *not* beyond Mills' reach.

The trial court professed to rely on the record, but we conclude it simply cannot support the conclusion the participation of Smaltz' firm will have a continuing effect in the litigation prejudicial to Mills. Both Wynn and Smaltz were deposed on the subject of the interview and testified extensively about the subject matter of the discussion. The trial court found "the 'recollections' of the witnesses are somewhat vague and in certain instances contradictory." No instances are specified. Moreover, Wynn indicated he was not concerned about speaking to Smaltz because they spoke *only* of matters of record. In its brief, Mills is reduced to arguing it can be *inferred* privileged information was exchanged.

 The difficulty with Mills' position, and that of the trial court, is the fundamental purpose behind rule 7-103 and its application to the circumstances of this case. The rule is designed to protect the integrity of the attorney-client relationship. Yet here the "client," Wynn as a Mills director, did not even know there was a lawsuit nor had he had any contact with Mills' litigation counsel. These facts are undisputed. Wynn was present at a director's meeting where consultation with counsel for the purpose of

litigation was authorized. But Mills made no attempt in its motion to disqualify to establish through other directors that litigation strategy or other appropriately confidential information was aired.

In short, the record does not support a conclusion a prejudicial revelation of the kind rule 7-103 was designed to prohibit ever took place. We do not mean to excuse Smaltz's action, as our affirmance of his personal disqualification demonstrates. At the same time, disqualification of his law firm is unduly punitive to Thrifty and Golden West in the absence of *some* showing prejudice resulted to Mills. Surmise, conjecture and resolving doubts in favor of disqualification do not suffice.

Nor can we ignore the fact Mills virtually concedes its position is adverse to Wynn insofar as the underlying merits of the litigation are concerned. Mills' counsel and Wynn have an attorney-client relationship *only* insofar as Wynn has been and remains an active director and as such may participate in the control of this litigation. As noted, when the Smaltz-Wynn interview took place, no action beyond possibly authorizing litigation had occurred as far as Wynn was concerned. And we cannot assume Wynn, particularly as an attorney, would breach his continuing duty as a director and reveal privileged information, if any, he possessed.

It is unfortunate the trial court did not balance the competing interests as required. (*William H. Raley Co.* v. *Superior Court, supra,* 149 Cal.App.3d 1042, 1048.) For the reasons stated in *Chronometrics,* we cannot say the disqualification of Smaltz personally was an abuse of discretion. But the same is not true with respect to Smaltz's law firm. The language of the court's order inescapably leads to the conclusion disqualification of the firm followed as a matter of course from Smaltz's disqualification. Taking into account all the circumstances, disqualification of the firm was unnecessarily punitive to Thrifty and Golden West and hence was an abuse of discretion. (*Chambers* v. *Superior Court, supra,* 121 Cal.App.3d 893; *Chronometrics, Inc.* v. *Sysgen, Inc., supra,* 110 Cal.App.3d 597.)

## VI

That leaves the portion of the order concerning use of the information obtained by Smaltz during the interview with Wynn. Largely for the same reasons we determined it was an abuse of discretion to disqualify Smaltz's firm, we clarify and restrict the scope of this portion of the order as well.

It reads: "All persons at Smaltz and Neelley, Latham and Watkins, Gulf, Golden West or Thrifty [*sic*] are prohibited from discussing, disclosing or

otherwise divulging any information or documents obtained by virtue of the communication between Smaltz and Wynn. [¶] The motion to disqualify the attorneys from the law firm of Latham and Watkins representing defendant Gulf Oil is denied. To the extent, however, that such attorneys are in the possession of information as a result of the Smaltz/Wynn communication, they are prohibited from using such information in the conduct of this litigation. Any doubts as to the use of any information will be resolved by the Court pursuant to in-camera proceedings."

To the extent the order prohibits Smaltz from any communication, the order is proper because he has been disqualified. We cannot assume compliance with this restriction is unrealistic. (See, e.g., *Chambers* v. *Superior Court, supra,* 121 Cal.App.3d 893, 903.)

Beyond that, as a suppression order, the quoted language is at best unworkable, as both sides appear to at least tacitly recognize. It is unclear whether the order purports to place the information discovered during the interview forever beyond the reach of Thrifty, Golden West and Gulf. As we shall discuss, such a remedy is inappropriate.

As a blanket order suppressing "everything" it is defective because it cannot be determined what was suppressed. (See *People* v. *Superior Court (Pierson)* (1969) 274 Cal.App.2d 228 [78 Cal.Rptr. 830].) In addition, there was no attempt to determine what was otherwise ordinarily discoverable material. At most, Mills was entitled to suppression until there was discovery by independent means, including ordinary discovery proceedings. (See *Standard Oil Company* v. *State of Iowa, supra,* 408 F.2d 1171, 1176.)

Beyond that, we note no suppression or other similar relief was ordered in *Chronometrics*. This appears to be at least tacit recognition no workable solution exists in such circumstances. That is certainly the case here, where the record indicates the discussion between Wynn and Smaltz involved discoverable material or information which could not reasonably be said to have a *substantial* continuing effect on the proceedings. (See *Chronometrics, Inc.* v. *Sysgen, Inc., supra,* 110 Cal.App.3d 597, 607.)

■ With a few exceptions not pertinent here, the exclusionary rule is simply not applicable to private information gathering. (*United States* v. *Jacobsen* (1984) 466 U.S. 109, 113 [80 L.Ed.2d 85, 94, 104 S.Ct. 1652, 1656]; *People* v. *Superior Court (Smith)* (1970) 70 Cal.2d 123 [74 Cal.Rptr. 294, 449 P.2d 230].) The obvious reason is private parties and their attorneys cannot be effectively deterred by the sanction of exclusion. In fact, the exclusionary rule is rarely applied in a purely civil action even where public agencies are involved and the government has seized the evidence. (See, e.g., *United States* v. *Janis* (1976) 428 U.S. 433, 447 [49 L.Ed.2d 1046,

1057, 92 S.Ct. 3021]; *Governing Board* v. *Metcalf* (1974) 36 Cal.App.3d 546, 549 [111 Cal.Rptr. 724].) This is usually true even in disciplinary proceedings prosecuted on illegally seized evidence. (*Gordon J.* v. *Santa Ana Unified School Dist.* (1984) 162 Cal.App.3d 530 [208 Cal.Rptr. 657]; *Emslie* v. *State Bar* (1974) 11 Cal.3d 210 [113 Cal.Rptr. 175, 520 P.2d 991].)

We are aware of no California precedent promulgating an exclusionary remedy where attorney disqualification is at issue. Further, *Chronometrics* rejects this approach. Consequently, Mills is left to objecting to specific items of evidence because they are *privileged.* The in camera proceedings suggested by the trial court's order, but involving any of the parties or law firms as necessary, may be used to resolve this narrow question.

Of course, our previous conclusions mean the trial court properly denied Mills' motion to disqualify Gulf's counsel and to suppress all discovery. ▮▮ In addition, Mills was not entitled to sanctions (Code Civ. Proc., § 128.5) for Thrifty and Golden West's opposition to the motion as we have concluded their position had substantial merit. Because of the sui generis nature of this case (see *William H. Raley Co.* v. *Superior Court, supra,* 149 Cal.App.3d 1042, 1049-1050, fn. 3), Mills' appeal of the issues on which it did not prevail is not frivolous within the meaning of *In re Marriage of Flaherty* (1982) 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179]. Consequently, we will not impose sanctions for Mills' appeal.

The order disqualifying Donald C. Smaltz is affirmed. The order disqualifying Smaltz's law firm, then Smaltz & Neelley, now Hahn, Cazier & Smaltz, is reversed. The court's suppression order is to be construed in a manner consistent with the views expressed in this opinion. Those portions of the order denying the disqualification of any attorneys in the law firm of Latham & Watkins, suppression of all discovery and imposition of sanctions are affirmed.

Crosby, Acting P. J., concurred.

**WALLIN, J.,** Concurring and Dissenting—I concur with the lead opinion's conclusion that disqualification of Attorney Smaltz's law firm is unwarranted in this case. However, I dissent from the conclusion that Smaltz personally must be disqualified. In my view, no disqualification is warranted in the unusual circumstances of this case. The lead opinion concludes that Smaltz should be punished, and his clients, Thrifty and Golden West, lose the value of his services because of a single conversation with Carol G. Wynn. In the underlying litigation, as the majority notes, "[Mills] is attempting to disavow and condemn actions Wynn took as its president." (Majority opn., *ante,* p. 127.)

Earlier in its opinion the majority states, "Mills virtually conceded its interests might be adverse to Wynn in the litigation, but nonetheless asserted its counsel represented Wynn at least in the limited capacity of protecting the corporation from Wynn divulging any adverse information." (Majority opn., *ante,* p. 125.) Apparently the majority suggests that Mills' counsel "represents" Wynn in that if Wynn chooses to divulge "adverse information" the counsel representing him should apply for a gag order from the trial court. Nothing in this record establishes that Wynn ever divulged any privileged information to Smaltz and the majority does not suggest any basis for concluding Mills has a right to keep any nonprivileged information known to Wynn from Thrifty and Golden West.

On this record, we must conclude that Wynn, an attorney and active member of the bar, is free to communicate with Smaltz or anyone else concerning the litigation. Mills certainly has no right to preclude him from divulging adverse information.

While I certainly agree that disqualification is frequently the appropriate remedy when an attorney discusses a pending matter with the opposing *client,* each case must examined on its merits. Smaltz learned no privileged information and his conduct in conversing with Wynn, who is not a party, does not even approach the conduct condemned in *Chronometrics, Inc.* v. *Sysgen, Inc.* (1980) 110 Cal.App.3d 597 [168 Cal.Rptr. 196]. In *Chronometrics* the offending attorney repeatedly contacted an opposing party and also involved others in his efforts to maintain the contacts and keep them secret from opposing counsel. Smaltz, on the other hand, had one conversation with Wynn and apparently learned nothing not otherwise discoverable. There also is some doubt, as the majority concedes, that Smaltz even knew Wynn was a director at the initiation of the conversation. This limited contact does not support disqualification.

I would reverse the lower court's order in its entirety and permit Smaltz and his law firm to continue their representation of Thrifty and Golden West.